## 73905. PERRY & COMPANY et al. v. NEW SOUTH INSURANCE BROKERS OF GEORGIA, INC. et al.
### (354 SE2d 852)

DEEN, Presiding Judge.

Appellants Perry & Company and its president Richard C. Perry appeal from a jury verdict and judgment in favor of appellees New South Insurance Brokers of Georgia (New South) and Southern Insurance Company (Southern). New South, a general insurance agency, was hired by Southern, a Texas corporation, to sell and manage its insurance policies in the state of Georgia. New South contracted with Perry & Company to finance policies issued by Southern through the efforts of New South. The action was initiated by appellees against appellants on the grounds that appellants had committed fraud in the handling of insurance policy cancellations and had also engaged in certain conduct which constituted tortious interference with New South's business, resulting in substantial losses. Perry & Company counterclaimed alleging that it had validly cancelled 852 insurance policies and was entitled to a refund of unearned premiums which appellees refused to pay.

The evidence before the jury was sufficient to establish that under the terms of the agreement entered into by the parties thousands of policies were written and financed by Perry. The insured would finance his policy by making a down payment to the agent who procured the policy, who would forward that to New South. The remainder of the policy was financed by the insured through an agreement with Perry signed at the time of the application. Perry would pay New South the balance of the premium owed and the insured was required to make monthly payments to Perry for his unpaid portion of the coverage. In the event the insured failed to make a monthly payment, Perry was entitled to begin cancellation procedures. Under the agreement between Perry and New South, Perry was to issue the insured a "ten day notice of intent to cancel," with notice also to be sent to New South. However, there was evidence that Perry actually sent this notice only to the insured and the procuring agent and no documents concerning the ten-day notice of cancellation were ever sent directly to New South. If Perry failed to receive payment during the ten-day period, under the agreement it was to issue a cancellation notice to the insured and to New South. Under OCGA § 33-22-13 it was also required that Southern be notified of the cancellation. Unknown to appellees, however, Perry held its copy of the cancellation notice for an additional seven days, and if payment was received dur-

ing that time would send the insured a document entitled a "reinstatement request," which in actuality operated to reinstate the policy. If the insured did not make a payment during the seven-day period Perry would then send New South a cancellation notice. By this practice, New South and Southern were at risk during the seven-day period in the event of a claim of loss, since no valid cancellation had occurred. Thus, if a loss arose, Southern had to pay it; if there were no loss, Southern and New South had to refund the prepaid premiums to Perry. It was shown that Perry also received payments from insureds after the seven-day period and after it had sent New South notice of cancellation, in which case Perry kept the payment from the insured as well as any refunded unearned premiums.

The jury returned a verdict in favor of New South for $200,000 compensatory damages jointly and severally against Perry & Company and Richard C. Perry; $69,500 in punitive damages against Perry & Company and $1 in punitive damages against Richard C. Perry; $10,000 to Southern as compensatory damages against Perry & Company and Richard C. Perry jointly and severally; and $1 in punitive damages to Southern from both Perry & Company and Richard C. Perry. On Perry's counterclaim against New South it was awarded $69,500.

1. Appellant Perry & Company contends that it was entitled to a directed verdict or judgment notwithstanding the verdict on its counterclaim in the amount of $135,646.68, because appellees admitted both in their pleadings and in testimony that this amount was owed as unearned premiums after cancellation of the policies of 852 insureds. New South alleged in its original complaint that after appellants' purported scheme and fraudulent acts became known to it, it withheld payment of those unearned premiums which it *believed* to be validly cancelled. At trial a representative of New South testified that the claimed amount of $135,646.38, which was based upon figures and documents produced by Perry, "[sounded] right." However, he also stated that it was appellees' position that this amount was "not owed." Moreover, the pre-trial order which controlled the course of the trial recited that although Perry contended that the amount of unearned premiums withheld by New South exceeded $139,000, "this amount remains uncertain." The pre-trial order also specifically delineated as issues to be determined by the jury whether appellees withheld unearned premiums from Perry and, if so, how many dollars in unearned premiums were actually withheld.

Under the circumstances, we are unable to agree with appellants that either the pleadings or the cited testimony constituted an admission in judicio so as to mandate a recovery of the amount Perry claimed to be owed. A primary issue in the case was whether Perry was owed *any* amount of unearned premiums as a result of its actions

in creating ineffective cancellations. While under OCGA § 24-3-30 either party may avail itself of allegations or admissions made in the pleadings, "[s]uch admissions, later amended, are not conclusive, and may be 'explained or disproved by the [party]. [Cits.]' [Cit.] Moreover, the rule that a party will not be allowed to disprove an admission made in his pleading without first withdrawing it from the record applies only to admissions of fact and is not applicable to an admission which is merely an opinion on the part of the party making it as to its legal effect. [Cit.]" *Scott v. Jefferson*, 174 Ga. App. 651, 652 (1) (331 SE2d 1) (1985). Accord *Aiken v. Dept. of Transp.*, 171 Ga. App. 154 (2) (319 SE2d 58) (1984).

2. Nor do we agree with appellants that there could be no fraud as a matter of law from gratuitously permitting the insureds seven extra days to cure their past due payments after cancellation of their policies, because this practice was authorized by the loan agreement between Perry and the insured. This court made it clear in *Balboa Ins. Co. v. Hunter*, 165 Ga. App. 273 (299 SE2d 91) (1983) that the statutory regulations governing premium finance cancellations and the return of unearned premiums in effect during the time involved here (OCGA §§ 33-22-14 (a) and 33-24-44 (c)) must be read in pari materia, and that therefore a cancellation is ineffective if a tender of the unearned premium is not made within 15 days of notice of cancellation.[1] See also *Alexander Underwriters Gen. Agency v. Lovett*, 177 Ga. App. 262 (339 SE2d 368) (1985). "The notice requirements of the statutes regarding cancellation of insurance policies are mandatory and require strict compliance and failure to adhere to the requirements results in noncancellation of the policy. [Cits.]" *Penn. Nat. Mut. Cas. Ins. Co. v. Person*, 164 Ga. App. 488, 490 (1) (297 SE2d 80) (1982).

Once a policy was cancelled, any payments accepted by Perry became unearned premiums owed back to the insured. If not paid within 15 days, the cancellation was voided and Southern was obligated by Perry's actions, of which it had no knowledge, to provide coverage. Moreover, if there was no cancellation Perry was not entitled to any refund of unearned premiums, and it was for these reasons that New South withheld the money that Perry asserted it was owed.

Perry's argument that these provisions are not applicable here because it was operating as a bank rather than as a part of the insurance industry ignores the fact that by the exercise of the state's regulatory powers over premium finance companies, their role has been recognized "as forming an integral part of the insured-insurer rela-

---

[1] The statute has been amended to preclude this result, now providing for a 25% penalty and interest rather than reinstatement of the policy. OCGA § 33-24-44 (c) (3) (Ga. L. 1984, p. 1345, § 4).

tionship." *Cochran v. Paco, Inc.*, 409 FSupp. 219, 222 (N. D. Ga. 1975). "As a matter of law, all existing and valid statutory provisions extend into and form an integral part of all contracts of insurance to which they are applicable. In case of conflict between the policy and the statutory provisions, the latter control." *Thames v. Piedmont Life Ins. Co.*, 128 Ga. App 630 (1) (197 SE2d 412) (1973). "Regardless of the terms of the [premium finance agreement], the minimum requirement for cancellation includes a return of the unearned premium within 15 days unless a rate investigation is necessary. No such investigation has been here alleged." *Powell v. Lititz Mut. Ins. Co.*, 419 F2d 62, 66 (5th Cir. 1969). Hence the conflicting terms of the financing agreement cannot be enforced. Cf. *Johnson v. Southeastern Fid. Ins. Co.*, 178 Ga. App. 431 (3) (343 SE2d 709) (1986).

The jury, by awarding Perry less than the amount it contended it was owed, must have concluded that many of the purported cancellations were in fact void. The evidence presented at trial was sufficient to authorize a determination that Perry had a long-standing policy of not cancelling on the date stated in the notice of cancellation, but of providing an additional seven days of coverage for the insured without the knowledge of the insurer. Thus the trial court correctly refused to direct a verdict or grant appellants' motion for j.n.o.v. on this issue. Cf. *Penn. Nat. Mut. Cas. Ins. Co. v. Person*, supra.

3. Appellants' enumerations of error based upon appellees' failure to prove their allegations of fraud disclose no reversible or harmful error. The trial court charged the jury as to fraud and bad faith penalties and attorney fees. While we think appellees' evidence was sufficient to entitle them to consideration of these issues, it is apparent that the jury did not base their verdict on any alleged fraudulent acts of appellants since it awarded no attorney fees for bad faith as sought. The evidence must be sufficient to support a recovery for fraud in order for the jury to make an award of attorney fees pursuant to OCGA § 13-6-11 for bad faith in making the contract. See *Seminole Peanut Co. v. Goodson*, 176 Ga. App. 42 (4) (335 SE2d 157) (1985); *F. N. Roberts Pest Control Co. v. McDonald*, 132 Ga. App. 257 (4) (208 SE2d 13) (1974). Since the jury made no award of attorney fees, it seems obvious that there was no finding of fraud and any error in this regard was thereby rendered harmless.

4. Appellees' amended complaint alleged a cause of action for tortious interference with New South's contractual relations and prospective contractual relations. Perry asserts that there is no legally recognized cause of action for which relief can be granted for tortious interference with "prospective" contractual relations; and that there was no evidence to show that it interfered with any existing contractual rights, nor any proof of damages therefrom.

The evidence in this regard disclosed that the amount of

unearned premiums owed by New South to Perry after cancellation was calculated by an arrangement known as a "batch system." When New South received a notice of cancellation from Perry it then notified the insured of the cancellation, filled in certain information on a "batch sheet" and sent it to Perry. Perry would then determine its payoff balance, after giving credit to the insureds for their interest and rebate, and return the batch sheets to New South. One check was written for a number of files rather than on each account. In August of 1982 New South began receiving telephone calls from insureds and procuring agents complaining that they had made payments for which they had not received credit from Perry, or that payments had been made but no reinstatement had occurred. New South had no way of knowing whether the claimed payments had in fact been made to Perry, and on at least three occasions received claims on policies that they believed had been validly cancelled. Upon investigation it was discovered that Perry had been accepting payments after cancellation without reinstating the insured or informing New South, and at the same time demanding return of unearned premiums through the batch system without crediting New South for any late payments accepted from the insureds. These three files were documented in detail at trial and there was also other evidence showing the same scheme. After learning of these activities, New South began withholding payments Perry claimed to be due under the batch system in order to determine the potential liability of both New South and Southern as a result of Perry's actions.

When 852 of these payments were withheld, Richard C. Perry wrote a letter to at least 100 insureds and some procuring agents in which he stated: "I think New South Insurance Brokers has held *your* money long enough!" The letters further suggested that the insureds and agents call New South and demand their refunds, and that the State Insurance Department be contacted if necessary. Prior to writing these letters Mr. Perry did not review the individual files to ascertain whether any money was actually owed the written insured or not, and at least one insured who had not been cancelled received a letter.

As a result of this conduct New South showed that it suffered a great reduction in its business. A number of procuring agents who had existing contracts with appellees but could place their business elsewhere reduced the amount of business placed with New South, and the renewal rate for insureds was severely affected. There was testimony that the relationship and reputation that New South had built with its agents and insureds was damaged because of the problems which ensued after Perry's actions, and that appellees' renewal rate of 60-70% dropped to 10-20% during this time. Broker statistics introduced in evidence showed substantial reduction in the procuring agents' business. New South's profits and loss statements showed a

profit in 1981 of $22,134; from January 1, 1982, through August 1982 New South showed a profit of $14,000; however, the figures from January 1, 1982 through November 30, 1982 showed a loss of $79,861. There was unrebutted testimony that 90% of this reduction in business and resultant loss of profits was due to Perry's actions, and Perry presented no evidence to the contrary.

"[T]he tort of the interference with contractual relations is not limited to the procurement of a breach of contract . . . [O]ne under a duty to render a performance has a property interest in the contract in that he has the right to render the required performance free from unjustified and unprivileged intentional invasions that retard performance or make the performance more difficult or expensive. Interference of that type constitutes an actionable tort which embraces within its scope all intentional invasions of contractual relations, including any act . . . interfering with the performance itself, regardless of whether breach of contract is induced. [Cits.] Interference with contractual relations is an *intentional* tort, and if intentional interference is to be required, it presupposes knowledge of the plaintiff's interests or, at least, of facts that would lead a reasonable man to believe in their existence. [Cit.] . . . It is a question of fact, and thus for the jury, whether the defendant has played a material and substantial part in causing the plaintiff's loss of any benefits of the contract." *Piedmont Cotton Mills v. H. W. Ivey Constr. Co.*, 109 Ga. App. 876, 879-80 (1) (137 SE2d 528) (1964). (Indentions omitted.) We conclude that the intentional interference with business relationships alleged here would fall within the scope of tortious interference of contractual relations as defined above. Cf. *Rouse v. Crum*, 169 Ga. App. 439 (313 SE2d 140) (1984).

The federal courts have held that under Georgia law, '[i]n establishing a cause of action for malicious interference with business relations, a plaintiff must demonstrate that the defendant (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury. [Cit.] . . . A cause of action for tortious interference also encompasses interference with a prospective business relationship as well as existing ones, [cits.]; the liability results not only from disruption of the relationship but also from elimination of the injured party's ability to perform. In order to establish a cause of action for interference with prospective business relations, the plaintiff must demonstrate that absent the interference, those relations were reasonably likely to develop in fact. [Cit.] . . . The Georgia Supreme Court has held that the term 'malicious' or 'maliciously' means any unauthorized interference or any interference without justification or excuse. *Luke v. DuPree*, 158 Ga. 590, 596, 124

SE 13 (1924). In the context of tortious interference with business, the term is to be construed liberally: The act is malicious when it is done with knowledge of the plaintiff's rights and with the intent to interfere with them. *Architectural Manufacturing Co. v. Airotec, Inc.*, 119 Ga. App. 245, 166 SE2d 744 (1969). See also *Slaughterback v. Intech Management Service, Inc.*, 247 Ga. 762, 279 SE2d 701 (1981). Personal ill will or animosity is not essential to a finding of malice. *Luke v. DuPree*, supra. Malice plus injury to business of itself does not, however, constitute the tort of wrongful interference with business. Rather, an independent wrongful act is required as well as an injury. [Cit.]" *Hayes v. Irwin*, 541 FSupp. 397, 429-30 (N. D. Ga. 1982). (Indentions omitted.) Accord *Wilcon v. Travelers Indem. Co.*, 654 F2d 976 (5th Cir. 1981).

Based upon this reasoning, we find appellants' arguments that there was no showing here of tortious interference with contract to be unavailing. Not only was there testimony from three former insureds that they did not renew their policies with New South due to Perry's actions, three of appellees' officers also testified as to the amount of damage caused both by Perry's scheme and in particular the letter. New South's introduction into evidence of broker statistics, as well as "distributed balance sheets" and "distributed income and expense statements" also established "a proven 'track record' of profitability" sufficient to allow recovery. See *Stern's Gallery of Gifts v. Corp. Property Investors*, 176 Ga. App. 586, 592 (3) (337 SE2d 29) (1985). This evidence showed a 90% loss of business during the three-month period in late 1982 after Mr. Perry mailed the letter, which warranted a finding that the loss was attributable to his acting "purposefully and with malice with the intent to injure." *Hayes v. Irwin*, supra. Thus, these issues were properly presented to the jury for determination. With all of the records before them, the jury was authorized to conclude that some policies had not been effectively cancelled so that only $69,500 in unearned premiums was owed to Perry due to proper cancellations; and also to award damages for tortious interference with appellees' existing and prospective business relationships. We find no grounds to mandate reversal for any reason asserted.

*Judgment affirmed. Birdsong, C. J., and Pope, J., concur.*

DECIDED FEBRUARY 23, 1987 —
REHEARING DENIED MARCH 10, 1987 — 

*E. Lewis Hansen, C. Michael Johnson, Harold N. Hill, Jr.*, for appellants.

*Wade K. Copeland, Wayne D. McGrew III*, for appellees.