A98A1549. NORTH GEORGIA READY MIX CONCRETE COMPANY, INC. v. L & L CONSTRUCTION, INC.
(508 SE2d 722)

McMURRAY, Presiding Judge.

Plaintiff-appellee L & L Construction, Inc. ("L & L") brought this contract action against defendant-appellant North Georgia Ready Mix Concrete Company, Inc. ("Ready Mix"), alleging that, as part of plaintiff's contract with S & S Mills, Inc. to construct a carpet warehousing facility in Whitfield County, Georgia, plaintiff engaged Ready Mix "to furnish concrete to be used . . . in the floor of said facility[, based in part because Ready Mix] represent[ed] that its product would conform to the specifications for the concrete floor incorporated into . . . the plans and specifications . . . and [also in part because of Ready Mix's] professed capability to furnish a product that would resist drying shrinkage." Throughout June 1994, defendant sold to plaintiff "approximately 3800 yards of 4,000 PSI concrete purportedly made with natural as opposed to manufactured

sand. . . ." Despite pouring the concrete slab using defendant's materials in a workmanlike manner, plaintiff subsequently discovered "significant and unacceptable amounts of drying shrinkage resulting in a phenomenon referred to in the industry as 'curling,' . . ." as a result of which, plaintiff was "forced to effect repairs to a large portion of the concrete slab at . . . substantial cost. . . ."

Plaintiff further alleged that this "curling" was proximately caused by defendant's wilful neglect in failing to supply plaintiff with a product fit for its intended purpose, despite plaintiff's reliance on defendant's assurances that the product was suitable for its intended application.

Defendant admitted it sold plaintiff 3,800 yards of 4,000 PSI concrete for the S & S Mills, Inc. project but denied the material allegations of breach of warranty. Defendant further counterclaimed for $15,303.75 allegedly owed it by plaintiff on account and also sought OCGA § 13-6-11 expenses of litigation for plaintiff's alleged stubborn litigiousness and bad faith. The case was tried before a jury which returned a $100,000 verdict in favor of plaintiff against defendant. Defendant's motion for judgment notwithstanding the verdict or a new trial was denied, and this appeal followed. *Held*:

1. In five related enumerations of error, defendant contends the trial court erred in denying its motions for directed verdict, arguing plaintiff failed to prove the existence of a contract to provide concrete with 80 percent natural sand and 20 percent manufactured sand; failed to prove any express warranty regarding mix design; failed to prove any intended particular purpose; failed to prove its privity with defendant; and failed to prove any breach was the proximate cause of the damages sustained.

" 'If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed.' OCGA § 9-11-50 (a). 'In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict. The standard used to review the grant or denial of a directed verdict is the "any evidence" test. [Cit.]' [Cit.]" *Dept. of Human Resources v. Thomas*, 217 Ga. App. 174 (1) (a) (456 SE2d 724). Viewed in the light most favorable to the party securing the verdict, the evidence at trial showed the following:

The floor slab specifications called for ".4[-inch] compacted 'pug mix', a graded aggregate base material. . . . The floor will have a 4 mil polyethylene vapor barrier and will be reinforced with 6x6-10/10 welded wire mesh. . . . The floor will be 6″ of [4,000] P.S.I. concrete poured on grade. The concrete mix will have natural white sand. . . . The floor will receive a trowel finish and will be sealed with one coat

of concrete sealer and hardener. . . . The floor will be sawed into areas approximately 780 sq. ft. . . ." Phillip Gerald Leonard, president of L & L, testified that he did not consider using Ready Mix for this concrete job because he experienced "problems with . . . Ready Mix with curling in the late Eighties," for which Ready Mix had to reimburse L & L more than $17,000. Leonard repeatedly told Gerald Edward Long, defendant's area manager for sales, that plaintiff "want[ed] the concrete to be all-natural white sand and no fly ash. . . . Gerald would say, 'Jerry, no problem, just trade with us [at Ready Mix]. We've got the best quality concrete mixes in the area. We have solved our curling problem.' And this was told to [Leonard] at least probably fifteen (15) to twenty (20) times." In discussing the details, "Gerald [Long] says, 'Jerry [Leonard], I would like to add some blue sand in this mix.' [Leonard] said, 'Gerald, you know I don't like blue sand, or manufactured sand at all.' He [Gerald Long] says, 'I know that, but we [Ready Mix] need a little bit for coarseness in this mix.'" Gerald Long initially proposed a mixture of "[s]eventy percent (70%) natural, thirty percent (30%) on the blue, or the manufactured [sand]. [Leonard was] will[ing to] allow . . . ten percent (10%) . . . blue sand, ninety percent (90%) on the natural sand. . . . Gerald [Long] said, '. . . I need more than that.' And [Leonard] said, 'Gerald, you know I don't want any of it. I don't like it. [Gerald Long replied,] 'I know that, Jerry, but trust me, we've got our curling problem worked out. We have no problem with curling. Just let me go with twenty percent (20%) on the manufactured sand, eighty percent (80%) on white natural.' [Leonard] said, 'Gerald, don't ask me no farther; eighty/twenty (80/20) is as far as I'll go.' He [Gerald Long] said, 'Fine.' And that's the way the job was traded on, eighty percent (80%) natural white, twenty percent (20%) blue." The only reason Leonard even "consider[ed] a trade . . ." with Ready Mix is because of the assurances that Ready Mix had resolved its prior problems with curling.

But Gerald Long "convinced [Leonard] to try to let him use an all blue sand in the footing, and said, 'Jerry, just let me start with that and we'll be able to save a little money by doing so. . . .' He [Gerald Long] said, '. . . just let me try it. If we have any problem with it, all you have to do is let me know and I [Gerald Long] will immediately change it. . . .' The next morning after the [first] pour, [Leonard saw] . . . hairline cracks lead away from [a grade] stob to each side of the width of the footing. [Leonard] called Gerald [Long] up and [told him], 'Gerald, change the concrete. I don't want no more of this.' He [Gerald Long] said, 'No problem.'" Leonard intended that Ready Mix go back to the agreed-upon mixture of 80 percent white natural sand and 20 percent blue manufactured sand. Leonard thought "the concrete that evening worked much, much better." In Leonard's experi-

ence, one does not have "near the shrinkage in natural sand that [one does] with the manufactured sand. Manufactured sand does have much more shrinkage, in turn, it could be in the form of cracking and also in the form of curling. . . . Also, [i]t's a very harsh mix. To use total blue sand without putting a fly ash with it, it will be a harsher mix. You can add a fly ash to it and it will flow better." To soften such harshness, "the main thing would be adding water. Water makes concrete flow better. . . . [But,] [w]ater has to leave the concrete and, in turn, causes shrinkage which can, in turn, be cracking and curling."

Leonard described the 12 pours involved in the floor slab as "the smoothest operation that [he had] ever been around. . . . And when . . . completed this, this was . . . the nicest, most level floor [Leonard had] ever seen." But after three months, Leonard was informed that there was visible "movement with the hysters that went across a joint." Leonard tried to remedy this by filling the joint with epoxy. But he "received a call from S & S Mills that they were having some additional movement in joints. . . . [A]t this time, [Leonard] felt sure [they] were having some curling problems." Upon inspection, the slab sustained "[v]ery excessive . . ." curling. Additionally, "there was spalling over a large part of the warehouse spread out throughout the building."

James Robert Longley, majority owner and vice-president of Ready Mix has known Leonard for a number of years, knew that Leonard believed "that concrete made out of blue sand would crack," and further knew that the particular purpose for this concrete would be a warehouse where "hysters that carried heavy carpet was going to be running over that floor. . . ." Longley confirmed that, "looking at the raw numbers in [his company's] batch records, the portions [are] about sixty-five/thirty-five (65/35). . . ." That is Ready Mix's "standard 4000-pound mix. . . ." Gerald Edward Long confirmed he changed the mix design after the first day's pour from 308 to 310, "an all white [sand] mix . . . [but then, on the third day's pour, he] went back to a 308 . . . [and] [n]ever [did] tell [Leonard] that [Ready Mix] went back to a blue mix. . . ." Donald E. Dixon, a consultant in forensic engineering, performed petrographic testing on core samples drilled from the slab. He confirmed the presence of both "a natural sand and a manufactured sand, which appeared to be from the same source as the coarse aggregate, the larger aggregate." Specifically, he found "sixty-five (65) manufactured sand and thirty-five (35) natural." In Dixon's opinion, "the water demand, or the amount of water necessary to make this concrete workable for a floor slab is too great[,] . . . producing a very high shrinkage which resulted in the curling problem." To recreate a two- and three-quarter-inch slump in the Ready Mix formulation used on most of the slab, Dixon "had to add 2.4 pounds of water[, the] equivalent to ninety-six (96) pounds

added to a cubic yard batch for 330 total pounds of water, as opposed to 234 shown on the batch records." Dixon concluded the "mix that was actually furnished on the job . . . the shape of the manufactured sand is so bad, so harsh, that it increased the water demand by a great amount. [Consequently,] the more water you have, the more shrinkage you have." In Dixon's opinion, if one "assume[s] that [this same] floor was placed, the same concrete but without the poly [vapor barrier], and if you quartered those panels, . . . the shrinkage problem is still there[, not] changed it at all."

In summary, the evidence authorizes findings that Gerald Long and Leonard agreed to a concrete mix containing no less than 80 percent white or natural sand and no more than 20 percent blue or manufactured sand. Gerald Long prevailed upon Leonard to permit a higher mixture of blue sand to pour the footings, upon Gerald Long's express promise to "change it," i.e., return to the original specifications, if Leonard were dissatisfied. Leonard was not satisfied and instructed Gerald Long to stop using the mixture containing a high proportion of blue sand. Defendant Ready Mix complied with this instruction, but only for one day, after which, defendant returned to the high blue sand mixture without informing Leonard. This high blue sand mixture is harsh, requiring substantial excess water for convenient pouring, and such extra water causes shrinkage and curling as observed in this floor.

"Any description of the goods which is made a part of the basis of the bargain creates an express warranty that the goods shall conform to the description." OCGA § 11-2-313 (1) (b). This is consistent with long-standing authority that, "[a]s applied to sales of personal property a warranty has been defined, as follows: 'A warranty is a statement or representation made by the seller of goods, contemporaneously with and as a part of the contract of sale, though collateral to the express object of it, having reference to the character, quality, or title of the goods, and by which he promises or undertakes to insure that certain facts are or shall be as he then represents them. The warranty may be express or implied. It is the former when created by the apt and explicit statements of the seller; the latter, when the law derives it by implication or inference from the nature of the transaction, or the relative situation or circumstances of the parties.' [Cit.]" *Elgin Jewelry Co. v. Estes & Dozier*, 122 Ga. 807, 809 (50 SE 949). In the case sub judice, the description of a concrete mix containing no more than 20 percent manufactured sand was not met, and the evidence authorizes the jury's determination that this failure to fulfill the contract under this description caused the concrete slab to sustain excessive curling. The first, second, and fourth enumerations are without merit.

2. The third and fifth enumerations, regarding implied warran-

ties, are rendered moot by our affirmance on the basis of the breach of an express warranty.

*Judgment affirmed. Blackburn and Eldridge, JJ., concur.*

DECIDED NOVEMBER 2, 1998.

*Minor, Bell & Neal, William F. Jourdain, James E. Looper, Jr.,* for appellant.

*Avrett, Ponder & Withrock, Robert M. Withrock, Smith, Currie & Hancock, Joseph C. Staak,* for appellee.