A00A1746. CAMP v. EICHELKRAUT et al.
A00A1747. EICHELKRAUT v. CAMP.
A00A1748. NICHOLSON v. CAMP.
(539 SE2d 588)

MILLER, Judge.
The following chronology is relevant to the disposition of these three appeals:

Jack Nicholson and Patricia Eichelkraut each owned ten percent of two closely held companies with Wayne M. Camp owning the remaining eighty percent. The companies provided forensic accounting and consulting services to surety and fidelity companies. When

Eichelkraut noticed questionable tax and accounting practices, she brought it to the attention of Nicholson, and they agreed to sue Camp for allegedly diverting money from the companies. On April 28, 1995, the morning of trial, Eichelkraut and Camp reached a settlement agreement which was reduced to writing and executed by all the parties a week later.

In the formal settlement agreement, they released each other and dismissed the suit. Eichelkraut and Nicholson sold their interests in the businesses to Camp and his companies in exchange for payments of $145,000 and $175,000, respectively. All parties agreed to a "NON-DISPARAGEMENT" provision whereby they would "cease and refrain from making any disparaging or defamatory remarks or comments regarding one another. . . ." This was understood by the parties to prohibit even truthful statements that put another in a bad light. And, in a "CONFIDENTIALITY" provision, they promised "not to disclose, directly or indirectly, any financial information . . . previously obtained," except as may be required pursuant to valid order or subpoena of a court of competent jurisdiction or at the request of a government regulatory agency. They also agreed to a mutual exchange or return of personal property, whereby Camp was entitled to "retrieve" any "original business records, [R]olodexes, diaries and computer disks" believed to be in Nicholson's or Eichelkraut's possession. At the time the agreement was executed, Nicholson's attorney (and Eichelkraut's former attorney) possessed a box of documents consisting of corporate documents, business records, and files Nicholson and Eichelkraut had copied from the office files. Nicholson and Eichelkraut warranted that they had not "copied any original (or copies thereof) documents which they are tendering back. . . ."

Meanwhile, Monte Green, a former employee fired by Camp for allegedly befriending Nicholson and Eichelkraut, decided to inform the police that Camp's businesses were engaged in illegal activities. Before contacting the police, Green attempted to enlist Nicholson's help. Nicholson declined, but alerted Eichelkraut that Green was contacting the police. Eichelkraut contacted Camp to alert him.

Green informed the Douglasville Chief of Police, Joe Whisenant, that he had reason to believe Camp was guilty of some kind of fraudulent behavior involving the Safeco and Continental insurance companies, and that Nicholson had information that could help with any investigation. In three interviews with police, including an interview with fraud investigators for the sureties Safeco and Continental present, Green outlined his suspicions that Camp was involved in fraud.

As a result of the tip from Green, Chief Whisenant telephoned Nicholson and "asked him to come in and see [him]," in order to con-

firm or deny Green's allegations. Nicholson refused to talk of any specifics without a subpoena, although he explained generally how the surety business works. Nicholson also gave Chief Whisenant the names of trustworthy contacts with the sureties. In response to a subpoena for the production of evidence in a grand jury criminal investigation, Nicholson (or his counsel) provided the police with the box of documents (invoices and time sheets, etc.) used by Eichelkraut and Nicholson in their first suit against Camp. After he testified before the grand jury, Nicholson was twice summoned back to Chief Whisenant's office, where he spoke with Safeco and Continental representatives as well as the police. While insisting that he truthfully answered all questions posed to him, Nicholson also conceded his truthful answers were disparaging of Camp.

In September 1995, Eichelkraut composed and Nicholson edited three anonymous letters, one sent to a federal judge who had appointed Camp as a bankruptcy trustee or administrator in an interpleader action against a fidelity bond, one sent to the ethics committee of the Georgia Society of Certified Public Accountants, and the third sent to the business editor of an Atlanta newspaper, all referencing the Douglas County police investigation of Camp for alleged insurance fraud.

In response, Camp brought the instant action against Nicholson and Eichelkraut alleging breach of the nondisparagement clause and other provisions of the settlement agreement and also for tortious interference with contractual and business relations. Nicholson and Eichelkraut counterclaimed for breach of contract (nonpayment), disparagement, and interference with contractual and business relations. In an earlier appeal, this Court affirmed the grant of partial summary judgment to Camp, holding the three letters violated the nondisparagement section of the settlement agreement[1] and were not privileged under OCGA § 51-5-7 in Camp's contract claim.[2]

On remand, the case went to a jury to determine Camp's damages and to decide the counterclaims. The trial court directed a verdict that Nicholson breached the financial confidentiality and nondisparagement covenants of the settlement agreement by speaking with representatives of Safeco and Continental. The court further directed a verdict that Nicholson and Eichelkraut breached the promise to return all personal belongings, memorabilia, and original records.

In special interrogatories, the jury returned verdicts against Eichelkraut for breach of contract ($145,000), against Nicholson for breach of contract ($175,000), against Eichelkraut for tortious inter-

[1] *Eichelkraut v. Camp*, 236 Ga. App. 721, 723 (1) (513 SE2d 267) (1999).
[2] Id. at 724 (1).

ference with business relations (in favor of the companies now wholly owned by Camp for $100,000 total), but further in favor of both Eichelkraut and Nicholson against Camp on their counterclaims for tortious interference with business relations ($240,000 and $276,753, respectively).[3] The trial judge initially granted Camp's motion for judgment notwithstanding the verdict on the tortious interference claims of Eichelkraut and Nicholson, but later vacated this decision and reinstated the verdicts on those claims.

From the final judgment on the jury's verdicts, all three parties appeal. In Case No. A00A1746, Camp enumerates as error the denial of his motion for j.n.o.v. as to the damages assessed against him for tortious interference. In Case No. A00A1747, Eichelkraut enumerates the direction of the verdicts against her for breach of contract and the denial of her motion for j.n.o.v. regarding tortious interference. In Case No. A00A1748, Nicholson enumerates the direction of the verdicts against him on Camp's breach of contract claims. The cases are hereby consolidated for disposition on appeal.

1. *Tortious Interference.* To recover under a theory of tortious interference with business relations, a plaintiff must show defendant: (1) acted improperly and without privilege, (2) acted purposely and maliciously with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury.[4] The term "maliciously" is broadly construed to encompass any unauthorized interference or any interference without legal justification or excuse.[5] A directed verdict or j.n.o.v. is authorized only "[i]f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict."[6] The denial of a motion for j.n.o.v. will be affirmed, if, after viewing the evidence in the light most favorable to the party securing the verdict, there is "any evidence" supporting the jury's verdict.[7] And the direction of a verdict must be reversed if there is "any evidence" supporting a contrary verdict.[8]

---

[3] The jury found against Eichelkraut and Nicholson on their counterclaims for breach of contract, found in their favor on Camp's claims of inceptive fraud, absolved Nicholson and his professional corporation of Camp's claim of tortious interference with business relations, and declined to award any punitive damages.

[4] *Renden, Inc. v. Liberty Real Estate &c.*, 213 Ga. App. 333, 334 (2) (444 SE2d 814) (1994).

[5] Id.

[6] OCGA § 9-11-50 (a).

[7] *North Ga. &c. Co. v. L & L Constr.*, 235 Ga. App. 68, 69 (1) (508 SE2d 722) (1998).

[8] *Redwine v. Windham*, 237 Ga. App. 149, 151 (513 SE2d 13) (1999).

## Case No. A00A1746

2. *Inducement.* An essential element of tortious interference with business relations is that the alleged tortfeasor used wrongful means[9] to induce a third party or parties not to enter into or continue a business relationship with the plaintiff.[10] Although Nicholson testified that the three former partners were "blacklisted" in the surety business, there is simply no evidence that any entity refused to hire Nicholson or Eichelkraut for particular work they otherwise would have received, but for Camp's improper inducements via wrongful means.[11] Thus, the jury's damage awards against Camp for tortious interference with business relations are not authorized by any evidence. In Case No. A00A1746, the trial court erred in denying Camp's motions for j.n.o.v. as to the tortious interference counterclaims of Nicholson and Eichelkraut.

## Case No. A00A1747

3. Proceeding pro se, Eichelkraut enumerates the failure of the trial court to grant her j.n.o.v. or a new trial[12] for any tortious interference with the business relationships of Camp & Associates, P.C. and International Surety Consultants, Inc.[13] The jury awarded each corporate plaintiff $50,000.

The specifications against Eichelkraut are the same facts and circumstances forming the bases for her alleged breaches of the settlement contract. First, she allegedly failed to properly return corporate documents prepared for her previous litigation such that Nicholson was in a position to turn them over to police and insurance investigators in response to a subpoena. Second, Eichelkraut's disparaging letters allegedly caused the two corporations to lose business. Eichelkraut argues that, even viewing the evidence in the light most favorable to the corporate plaintiffs, there is no evidence of impropriety, malice, or improper inducement resulting from the

---

[9] "Such wrongful means generally involve predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *American Buildings Co. v. Pascoe Building Systems*, 260 Ga. 346, 349 (2) (392 SE2d 860) (1990). Accord *Tom's Amusement Co. v. Total Vending Svcs.*, 243 Ga. App. 294, 296 (2) (a) (533 SE2d 413) (2000) (physical precedent only).

[10] *Renden, Inc. v. Liberty Real Estate &c.*, supra, 213 Ga. App. at 335 (2) (b).

[11] See id. at 335 (1) (plaintiff must demonstrate that absent the alleged interference, business relations were in fact reasonably likely to develop).

[12] Eichelkraut joined in motions for directed verdict, including the argument that plaintiffs failed to make out a prima facie case of tortious interference. Consequently, plaintiffs' contention that this issue is not preserved for appellate review is without merit.

[13] The jury simultaneously found for Eichelkraut and against Camp individually on his own claim for tortious interference.

alleged failure to turn over the litigation documents. She further argues there is no evidence that any surety refused to do business with either corporate plaintiff as a result of her letters. We agree.

(a) *Failure to Return.* After the hearing where she and Camp came to their agreement to settle, Eichelkraut sealed all the litigation documents and records she was to turn over in a box, marked it confidential, took the box to her former attorney's office and left it there, with the understanding that the papers would be turned over to Camp's attorney. The only papers she kept related to personal income tax matters, as contemplated by the settlement agreement. Camp himself admitted there was not "any problem with the documents. That fact that they took them to the police and lied about them, . . . that's the problem." Yet it is undisputed that Eichelkraut herself never testified before the grand jury.

Plaintiffs argue that Eichelkraut's alleged failure to comply set into motion a series of events that enabled the police and fraud investigators to examine corporate documents to detect double billing.[14] In our view, however, Eichelkraut's failure to *personally* return to Camp the litigation documents she boxed up and placed out of her control is not the legal cause of any fidelity insurer's subsequent failure or refusal to do business with plaintiffs Camp & Associates, P.C. or International Surety Consultants. There simply is no evidence that Eichelkraut intended to harm these businesses improperly by delivering them into the hands of the defense attorney who formerly represented both Eichelkraut and Nicholson. The direct evidence is that Eichelkraut believed she was in compliance with her contractual obligations in so doing, and a substantial compliance is all that was required of either party.[15] Moreover, plaintiffs failed to produce or even identify a single insurer that refused to do future business with Camp & Associates or International Surety Consultants *as a result* of Eichelkraut's alleged failure to comply with the "return-of-property" provision of the settlement agreement.[16] Consequently, any alleged breach of that provision of the settlement agreement cannot sustain

---

[14] This argument overlooks the significance of the grand jury subpoena, issued as a result of Green's initial statements to investigators and Nicholson's reluctance to breach the settlement agreement on his own initiative.

[15] *Morgan v. Colt Co.*, 34 Ga. App. 630, 631 (3) (130 SE 600) (1925), interpreting former Civil Code (1910) § 4318, now OCGA § 13-4-20. See generally *Henderson Warehouse Co. v. Brand*, 105 Ga. 217, 222 (2) (31 SE 551) (1898).

[16] See *Jenkins v. Gen. Hosp. of Humana*, 196 Ga. App. 150, 151 (395 SE2d 396) (1990) (summary judgment against claim of tortious interference with business relations properly granted where plaintiff was "unable to name a single patient he has lost or failed to acquire due to the actions of defendants"). Accord *Lively v. McDaniel*, 240 Ga. App. 132, 135 (3) (522 SE2d 711) (1999) (where the undisputed evidence showed that defendant's conduct did not induce anyone to refuse or discontinue a business relationship with plaintiff, trial court erred in denying summary judgment).

the verdicts for tortious interference. The trial court erred in failing to grant Eichelkraut's motion for j.n.o.v. as to any tortious interference predicated upon her failure to return the litigation documents.

(b) *Disparaging Letters*. Eichelkraut's letters to the federal judge and to the Ethics Committee of the Georgia Society of Certified Public Accountants were dated September 18, 1995, and the letter to the business editor of the Atlanta newspaper was dated October 12, 1995. Camp's evidence shows that the business relationships allegedly interfered with are (1) those pre-existing relations with sureties Safeco and Continental, and (2) those desired relations with other fidelity insurers.

As to his financial damages, Camp testified that, after one letter was sent to the federal judge, lawyers stopped referring fidelity bond claims to him. But it is uncontradicted that when Eichelkraut suggested they pursue additional bankruptcy work, Camp "said there wasn't enough money in bankruptcy trustee work." According to Camp, he was unable to obtain replacement fidelity business because of the damage to his professional reputation. In 1994, Camp's businesses had combined revenues exceeding $5 million, whereas in 1998 he had essentially zero earnings from fidelity business. Revenue growth had averaged 50 percent annually from 1990 to 1995.

(i) *Existing Relationships*. The only evidence from fidelity insurers with existing relationships with Camp and his companies came from Safeco representative Gregory Lee Sears, the director of internal auditing since 1989. Safeco first learned of possible double billing and other irregularities in May 1995 through a telephone call from Douglasville Police Chief Whisenant to Safeco's home office Surety Department. Safeco saw the disputed litigation documents through Nicholson or his attorney via a subpoena, but never received any of Eichelkraut's anonymous letters. After an interview in July 1995 where Camp tried to rationalize certain documented double billings and admitted giving lucrative favors to Don Reedy (the Safeco claims representative who steered business to Camp), Sears concluded in August 1995 that Safeco should discontinue business with Camp or any of his organizations because of a loss of confidence in him, expressly disavowing mere rumor or adverse publicity as the cause of that decision. Thus, the direct evidence is that Safeco's decision to terminate business relationships with Camp or any of his corporations *preceded* Eichelkraut's composition and posting of the three letters (none of which was received by Safeco). Plaintiffs adduced no direct evidence from Continental about its decision not to do further business with Camp. Nevertheless, Camp admitted that, after Continental conducted its own investigation of Camp's enterprises in June 1995 at his offices, he received no further business from that insurer.

Circumstantial evidence from which the existence of a fact might be inferred, but which did not demand a finding for the plaintiff to that effect, will not support a verdict, when by positive and uncontradicted testimony of unimpeached witnesses, which was perfectly consistent with the circumstantial evidence relied on by the plaintiff, it was affirmatively shown that no such fact existed.[17]

The circumstantial evidence that Camp got no more business from Safeco or Continental after Eichelkraut sent her letters (but also after the insurers' own investigations) does not demand the conclusion she induced or caused that result (no matter her intent) and so amounts only to an inconclusive inference that cannot overcome the direct evidence that the decisions of Safeco and Continental were reached independently of Eichelkraut's actions.[18] Viewed in the light most favorable to plaintiffs, who obtained the verdict, the evidence does not support a claim against Eichelkraut for tortious interference with existing business relationships,[19] via her letters. Consequently, the trial court further erred in denying Eichelkraut's motion for directed verdict as to this portion of the claim.

(ii) *Prospective Relationships.* In order to establish a cause of action for interference with prospective business relations, the plaintiff must establish that absent the interference, those relations were reasonably likely to develop in fact.[20] And there can be no recovery in tort for an injury resulting from acts or omissions that violate no law.[21] Truthful statements about nonconfidential matters will not support a claim for tortious interference based on defamation, for they are privileged.[22]

Eichelkraut testified that her letters were truthful. Each letter correctly referred to the circumstance that Camp was under investi-

---

[17] (Citations omitted.) *Myers v. Phillips*, 197 Ga. 536, 542 (4) (29 SE2d 700) (1944).

[18] See, e.g., *Allen Kane's Major Dodge v. Barnes*, 243 Ga. 776, 781 (257 SE2d 186) (1979).

[19] We express no opinion whether Eichelkraut could be considered a stranger to the underlying relationships, as is required in tortious interference with business relations claims. *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 609 (2), fn. 2 (503 SE2d 278) (1998).

[20] *Renden, Inc.*, supra, 213 Ga. App. at 334-335 (2). Accord *Perry & Co. v. New South Ins. Brokers of Ga.*, 182 Ga. App. 84, 89 (4) (354 SE2d 852) (1987).

[21] *Irwin v. Torbert*, 204 Ga. 111, 123 (5) (49 SE2d 70) (1948).

[22] *Singleton v. Itson*, 192 Ga. App. 78, 80 (383 SE2d 598) (1989) (truthful statements and critical personal opinions made by one employee about another are not wrongful or unlawful and so trial court correctly directed verdict on claim for tortious interference with contractual relations). And while fair competition is always lawful, the use of truthful confidential or proprietary information to attract away all or a large portion of a business's trained personnel can support a claim of tortious interference. *Architectural Mfg. Co. of America v. Airotec, Inc.*, 119 Ga. App. 245, 251 (2) (166 SE2d 744) (1969).

gation by the Douglas County District Attorney for possible fraud. The letter to the federal judge overseeing Camp as a fidelity bond claims administrator in bankruptcy queried: "Before this information is given to the press, shouldn't you reconsider your choice of Trustee?" but does not mention plaintiffs Camp & Associates, P.C. or International Surety Consultants. The letter to the Georgia Society of Certified Public Accountants recites that Camp's daughter Dana Pilgrim joined her father in a new practice and alleges that the letterhead for the new firm lists cities where the firm is not licensed and maintains no offices.[23] This letter does not refer to plaintiffs Camp & Associates, P.C. or International Surety Consultants. The letter to the business editor of the Atlanta newspaper notes that, in addition to the district attorney's investigation, "[f]ormer clients, Safeco Insurance Company and . . . CNA [Continental] Insurance are also investigating Mr. Camp for double billings, overbillings, and fraudulent billings." The only reference to any identifiable Camp enterprise is the truthful observation that "Mr. Camp is no longer in the firm of Camp, Nicholson, and Eichelkraut. Nicholson and Eichelkraut filed a lawsuit against Mr. Camp and left the firm."

In short, we find no untruthful or defamatory reference to either Camp & Associates, P.C. or International Surety Consultants in any of Eichelkraut's ill-considered letters. And plaintiffs adduced no evidence from any particular fidelity insurer that it likely would have retained plaintiffs but for Eichelkraut's letters.[24] The fact that each corporation had reduced earnings is directly attributable to the independent decisions of Safeco and Continental not to renew or extend existing business relations, due to a loss of confidence in Camp and his affiliates. Consequently, plaintiffs failed, in our view, to support this verdict with any competent evidence that a business relationship was likely to develop in fact, or that any such likely prospective relationship was wrongfully spoiled by Eichelkraut's letters. An award for tortious interference with prospective business relations cannot be based on speculation that a relationship would develop. The trial court erred in denying Eichelkraut's motion for directed verdict as to any claim for tortious interference.

4. *Contractual Damages.* It is the law of the case[25] that Eichelkraut and Nicholson jointly breached the settlement agreement by writing, editing, and sending the anonymous letters. Nevertheless, Eichelkraut moved for a directed verdict on this contract claim

---

[23] The jury found that Eichelkraut did not tortiously interfere with Pilgrim's business relations.

[24] *Jenkins v. Gen. Hosp. of Humana,* supra, 196 Ga. App. at 151; *Lively v. McDaniel,* supra, 240 Ga. App. at 135 (3).

[25] OCGA § 9-11-60 (h).

against her, arguing Camp failed to prove his damages (lost profits) with sufficient specificity. The denial of that motion is enumerated as error.

As an alternative measure of damages, plaintiffs sought to recover the lost value of the stock they purchased from Nicholson and Eichelkraut, which they put at the purchase price because the stock was now worthless. "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach."[26]

The jury's verdict of $145,000 against Eichelkraut is the amount Camp and the plaintiff corporations agreed to pay her for her interests in the two companies. The contract verdicts against Nicholson and Eichelkraut clearly evince the jury's determination to deprive them of the benefit of their settlement bargain, after the anonymous letter campaign rendered the shares purchased in that agreement worthless. Regardless of any alleged failure of proof regarding lost profits, the jury's verdict in contract (resembling an offset) was contemplated by the plaintiffs' demands and authorized in law because "[d]amages are given as compensation for the injury sustained as a result of the breach of a contract."[27] The policy of the law is to place the injured party, as near as may be, in the situation he would have occupied absent the breach.[28] The trial court correctly denied Eichelkraut's motion for directed verdict as to this contract claim.

5. *Breach of Settlement Contract.* Eichelkraut contends the trial court erred in directing a verdict that she breached the so-called "return-of property" provision in the settlement agreement by failing to tender back all original records. The denial of her motion for j.n.o.v. also is enumerated. The record reflects a general verdict for contractual damages, which does not differentiate between alternative theories of contractual liability. "It is the practice, and legally permissible, to allege in one petition, in different counts, the breach of the same contract in different ways. In such a situation a general verdict is sustainable if any count is supported by evidence."[29]

In our view, any error in directing the verdict as to this separate contractual claim is clearly harmless or immaterial because of the authorized verdict awarding Camp contractual damages for Eichelkraut's writing the anonymous letters. Similarly, the failure to direct a verdict in Eichelkraut's favor on this claim would not vitiate that

---

[26] OCGA § 13-6-2.
[27] OCGA § 13-6-1.
[28] *Albany Phosphate Co. v. Hugger Bros.*, 4 Ga. App. 771, 776 (3) (62 SE 533) (1908).
[29] (Citations omitted.) *Williams v. Smith*, 71 Ga. App. 632, 637 (1) (b) (31 SE2d 873) (1944).

authorized verdict. Consequently, this enumeration is moot.[30]

6. Eichelkraut has failed to demonstrate how the trial court abused its very broad discretion in refusing (thus far) to release settlement payments Camp paid into the registry of the court during the pendency of the case, including her appeal.[31] Her fourth enumeration is without merit.

## Case No. A00A1748

7. *Nondisparagement*[32] *and Confidentiality.*[33] Camp eschewed any claim of damages for Nicholson's appearance under subpoena before the grand jury, but argued that, because there purportedly is no law compelling Nicholson to voluntarily speak with the authorities, Nicholson therefore breached the settlement agreement by his other so-called noncompulsory meetings with the authorities, including the fraud investigators for Safeco and Continental. The trial court's direction of the verdict that this constituted a breach of the settlement agreement is enumerated as error. While it is also the law of the case that sending the anonymous letters was not privileged under OCGA § 51-5-7 in a contract action,[34] the question remains whether the public policy of Georgia will enforce the contractual confidentiality and nondisparagement provisions under these circumstances.

At common law it was a penal offense for any citizen having knowledge of a crime to fail to report it and assist in producing the evidence.[35] Reporting criminal behavior is expected and even demanded of the ordinary citizen, who should not be discouraged from reporting what he knows to the authorities and from lending his aid to secure evidence of a crime.[36] Indeed, in Georgia, it is the duty of one having such information to report it to those in authority.[37]

---

[30] OCGA § 5-6-48 (b) (3).

[31] See *Courtesy Leasing v. Christian*, 266 Ga. 187 (465 SE2d 443) (1996).

[32] Non-Disparagement — The parties agree that henceforth they shall cease and refrain from making any disparaging or defamatory remarks or comments regarding one another, expressly or by implication, including but not limited to any parties' personal or business dealings and reputations.

[33] "It is the intent of the parties that the terms of this agreement be maintained as strictly confidential."

[34] *Eichelkraut v. Camp*, supra, 236 Ga. App. at 724 (1). Compare *Hardaway v. Sherman Enterprises*, 133 Ga. App. 181 (210 SE2d 363) (1974) ("Statements made in good faith pursuant to investigation by police or other officers authorized to investigate crime or criminal activity are made in the performance of a public duty and are privileged. [Cit.]").

[35] *Williams v. State*, 126 Ga. App. 302 (1) (190 SE2d 807) (1972).

[36] Id. at 303 (1).

[37] *Hardaway v. Sherman Enterprises*, supra, 133 Ga. App. 181.

And in *Barger v. Garden Way*,[38] this Court held:

> The public policy of Georgia does not permit parties to contract privately for the confidentiality of documents or testimony, and thereby foreclose others from obtaining, in the course of litigation, materials that are relevant to their efforts to vindicate a legal position. To hold otherwise would clearly not serve the truth-seeking function of discovery in civil litigation.[39]

If the public policy of Georgia does not permit parties to contract to keep embarrassing-but-discoverable materials secret, then with greater force, that public policy does not permit parties to enter into an enforceable agreement to keep arguably criminal matters secret in the face of an official investigation.

Here, it is undisputed that Chief Whisenant summoned Nicholson to his office for questioning both before and after Nicholson's grand jury appearance. In our view, Nicholson's act of repeating or confirming his suspicions (and the factual bases therefor) to Safeco and Continental fraud investigators, in the presence of and at the behest of Chief Whisenant during an official police investigation, did not amount to an actionable breach of the confidentiality and nondisparagement provisions. Such permission to cooperate with an official investigation or inquiry is expressly contemplated in the provision on the confidentiality of financial documents. We hold that such permission to cooperate with investigative authorities also is an implied term of both the nondisparagement provision and the confidentiality provision.[40] Such an interpretation gives full effect to the legitimate purposes of the confidentiality and nondisparagement provisions without running afoul of the public policies of Georgia.[41] The trial court erred in directing a verdict that Nicholson breached the settlement agreement by cooperating with the police and the fraud investigators for the sureties.

8. For the reasons discussed in Division 4, supra, the trial court did not err in denying Nicholson's motion for directed verdict as to the award of $175,000 in contract damages against Nicholson for his part in Eichelkraut's poison pen campaign.

*Judgments affirmed in part and reversed in part in Case Nos. A00A1747 and A00A1748. Judgment reversed in Case No. A00A1746.*

---

[38] 231 Ga. App. 723 (499 SE2d 737) (1998).

[39] (Citations and punctuation omitted.) Id. at 726 (1) (c).

[40] Id. at 726 (1) (d) (provision in confidential settlement agreement that party may nevertheless testify or otherwise comply with a subpoena, court order, or other applicable law is an implicit term in such agreement).

[41] Id.

*Pope, P. J., and Mikell, J., concur.*

DECIDED SEPTEMBER 21, 2000 —
RECONSIDERATION DENIED OCTOBER 6, 2000 —

Bondurant, Mixson & Elmore, H. Lamar Mixson, Jill A. Pryor, Lynn M. Adam, for Camp.

Patricia Eichelkraut, *pro se.*

Hartley, Rowe & Fowler, Joseph H. Fowler, Christopher A. Bennett, Wasson, Sours & Harris, Gene E. Massafra, for Nicholson.