A06A1314. MONTERREY MEXICAN RESTAURANT OF WISE, INC. et al. v. LEON.
(638 SE2d 879)

MIKELL, Judge.

Hector Leon brought this action against Raul Leon,[1] Monterrey Mexican Restaurant of Wise, Inc. (the "Corporation"), and Jose Onate,[2] by his Complaint filed August 4, 2000, and subsequently

---

[1] Raul Leon died of a methamphetamine overdose on November 9, 2001. Michael T. Smith, administrator of the estate of Raul Leon, was substituted as a party defendant below by order dated October 13, 2003. For ease of reference, Raul's name will be substituted for Smith's throughout this opinion.

[2] To avoid confusion, Hector Leon, Raul Leon, and Jose Onate are referred to in this opinion by their first names.

amended, alleging claims for conversion, assumpsit, and money had and received; breach of fiduciary duty by Raul and Jose; breach of fiduciary duty of fair and equitable treatment of a minority shareholder by Raul and Jose; fraud; appointment of a receiver; attorney fees under OCGA § 13-6-11; and punitive damages. Following a two-day bench trial, the trial court entered amended findings of fact, conclusions of law, and judgment (the "Amended Order"), finding that Hector's stock in the Corporation had been wrongfully converted and that he had been deprived of his shareholder interest in the Corporation as of January 1, 1999, and rendering judgment in favor of Hector in the amount of $208,324, plus prejudgment interest. The Corporation, Raul, and Jose ("appellants") appeal[3] the Amended Order,[4] enumerating several errors. For the reasons that follow, we affirm in part, reverse in part, and remand to the trial court with direction.

Viewed in a light most favorable to the trial court's findings, as we are required to do on appeal following a nonjury trial,[5] the evidence showed the following. Raul owned interests in 57 to 65 corporations formed to run "Monterrey" Mexican restaurants. Hector and Jose both regarded Raul as their "patrone," or patron, a person who gives instructions and tells people what to do, a boss to be followed without question. Hector had known Raul from childhood and called him "Uncle," although Raul and Hector's father were actually second cousins.

From 1993 Hector worked for Raul at a number of Monterrey restaurants in various U. S. cities. In 1995, Raul sent Hector to the town of Wise, Virginia, to investigate the possibility of starting a Monterrey restaurant there. Raul, Hector, and Jose then formed the Corporation under Georgia law to operate a restaurant in Wise, with corporate records reflecting that a total of 3,000 shares were issued, 1,000 shares each to Raul, Jose, and Hector; that each shareholder had paid $1,000 for the shares; and that Raul, Jose, and Hector were the sole officers and directors of the Corporation. These corporate, tax and accounting records for the Corporation, as well as those for Raul's other corporations, were always prepared under instructions from Raul by Superior Bookkeeping, an accounting firm.

---

[3] By its order dated November 7, 2005, this Court dismissed a prior appeal in this matter (Docket No. A05A0951) for lack of jurisdiction. All references in this opinion to the bench trial transcript are made to the record found under Docket No. A05A0951.

[4] The lower court's Amended Order was signed on November 14 and filed on November 15, 2005, before the remittitur was filed with the lower court on November 28, 2005. Although the lower court was technically without jurisdiction to enter the Amended Order, nonetheless we are entertaining this appeal in the interest of judicial economy. See *Dept. of Transp. v. Petkas*, 189 Ga. App. 633, 636 (2) (377 SE2d 166) (1988).

[5] *Park v. Fortune Partner*, 279 Ga. App. 268 (630 SE2d 871) (2006).

The corporate records, including the stock certificates, were not signed or executed by any officer of the Corporation. Although a stock certificate in the Corporation was completed for each shareholder, none of these certificates were dated or signed, nor were any actually issued to any of the shareholders. There was no evidence in the record that a stock register was ever maintained by this Corporation. Further, the Corporation "pretty often" received capital infusions from the owners in cash, and the owners received cash payments from the Corporation, all without receipts being given. The evidence showed that this lack of attention to corporate recordkeeping was typical for all the corporations in which Raul had an interest.

The Corporation filed state and federal corporate tax returns, made a Subchapter S election for federal tax purposes, made corporate filings required by state and local law, and conducted business with outsiders as a corporation. Until 1999, all these filings and records that referenced the stock ownership of the Corporation reflected that Raul, Hector, and Jose each held 1,000 shares in the corporation, or a one-third share. The trial court found that the Corporation was a valid corporation, and that 1,000 shares had been validly issued to Hector and fully paid for, the subscription price being $1,000.

From the formation of the Corporation, Raul was the "boss." It was Raul who owned the rights to the name "Monterrey," Raul who owned the wholesale supply company from which the restaurant obtained food and supplies, Raul who had the lease on the restaurant's premises, and Raul who made all the business decisions. Neither Hector nor Jose was well-versed in corporate formalities; nonetheless, their expectation was that each shareholder held an equal one-third interest in the corporation. Hector and Jose expected to contribute capital and to work at the restaurant; Raul, however, did not work on site at the restaurant, but supervised the operations of all his corporations and handled business matters.

In 1996, after the Virginia restaurant had been in operation for about a year, Hector stopped working there and moved away. Later, at Raul's request, Hector worked at another restaurant controlled by Raul in Suwanee. In 1998, however, Hector left Raul's employ for good, and Raul informed Superior Bookkeeping that Hector no longer had any part in the Corporation. The corporate records were changed as of January 1, 1999, to show that Raul owned 2,000 shares, Jose owned 1,000 shares, and Hector owned zero shares. Hector learned that he was no longer a shareholder in April 1999.

The tax returns of the Corporation for 1997 and 1998 showed Subchapter S corporate profits allocated equally among Raul, Hector, and Jose; in 1999, by contrast, the income of the Corporation was

allocated two-thirds to Raul and one-third to Jose. Hector never received his share of corporate profits for 1997 or 1998, nor for any year thereafter.

1. *Hector's interest in the Corporation.* At the outset, we must determine if the trial court erred, as contended in appellants' third enumeration of error, in finding that Hector owned one-third of the corporation. Only if Hector owned one-third of the business do we need to reach the issue of whether appellants converted Hector's stock, because a claim for conversion for corporate stock cannot be maintained by one without title.[6]

The trial court found that Hector owned a one-third interest in the Corporation, that Hector had paid $1,000 for these shares, and that this payment represented payment in full for the shares. Appellants assert that the trial court should have found that Hector failed to pay the $70,000 alleged to be the price of his stock in the Corporation and therefore he had no ownership interest in it.

> Upon appellate review, factual findings made after a bench trial shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. OCGA § 9-11-52 (a). The clearly erroneous test is the same as the any evidence rule. Thus, an appellate court will not disturb fact findings of a trial court if there is any evidence to sustain them.[7]

Further, "[a]fter judgment every presumption and inference favors it and the evidence must be construed to uphold rather than to destroy it."[8]

Appellants contend that the trial court erred in stating that "[t]here is no evidence in the record that the shares were not fully paid for by Hector Leon the price being One Thousand Dollars." It is apparent, however, that the trial court refers here to the uncontradicted testimony of Maritza Dubroca, vice president of Superior Bookkeeping. According to her testimony, the initial start-up funds for the Corporation amounted to $30,000, which represented $10,000 from each shareholder, allocated as $1,000 for the stock subscription

---

[6] *Reid v. Caldwell,* 114 Ga. 676, 677 (40 SE 712) (1902) (court assumed without deciding that an action for trover would lie for corporate stock). Historically, the action of trover lay to redress the tort of conversion. *Decatur Auto Center v. Wachovia Bank,* 276 Ga. 817, 819, n. 5 (583 SE2d 6) (2003) ("Conversion is a tort for which the action of trover is maintainable") (citation and punctuation omitted).

[7] (Citation and punctuation omitted.) *Sam's Wholesale Club v. Riley,* 241 Ga. App. 693 (527 SE2d 293) (1999).

[8] (Citations and punctuation omitted.) *Nabors v. Blanche Reeves Interiors,* 139 Ga. App. 638 (1) (229 SE2d 117) (1976).

and $9,000 as a loan to the Corporation. The corporate records also showed that each shareholder had contributed $1,000 for 1,000 shares of stock, representing one-third of the business. These records were corroborated by financial and tax filings by the Corporation which reflected that Hector owned one-third of the Corporation. Thus, evidence in the record supports the trial court's finding that Hector owned a one-third share in the Corporation from its formation in 1995.

Although there is testimony in the record that Raul required Jose and Hector to contribute $70,000 each to the enterprise, this testimony is conflicting. Jose testified that he had contributed to the Corporation all that was expected of him; however, he had no receipts for these cash contributions and he could not state with certainty how much he had been required to contribute, although he thought it was around $70,000; nor did he have any knowledge of how much Hector was expected to contribute to the Corporation. On the other hand, Hector testified that he paid $10,000 "for the restaurant"; that he contributed a total of $37,500 to the Corporation; that he did not know how much he was required to contribute; and that Raul had never told him a specific number, but that Raul had requested "around $70,000." Hector's direct testimony contradicted his answers to appellants' interrogatories; there, he stated that the price of the shares was $70,000. As this Court has often noted, "[e]ven in the face of conflicting evidence, the trial court's judgment will be upheld as long as there is 'any evidence' to uphold the lower court's determination."[9]

In removing Hector from shareholder status, Raul had Superior Bookkeeping prepare minutes of the Corporation for August 1998 which stated that Hector had failed to pay for his shares in full and was therefore not in compliance with the "Stock Acceptance Agreement." An unexecuted copy of this Stock Acceptance Agreement was kept among the records of the Corporation maintained by Superior Bookkeeping. The trial court specifically found that neither Hector nor Jose was aware of, nor did either sign, this Stock Acceptance Agreement,[10] a finding not challenged by appellants. Moreover, the trial court also found that Hector never received any written demand from the Corporation stating that he had not paid money that he was required to contribute, nor was he given any notice of forfeiture of his stock, nor was his stock returned to the Corporation; instead, it was thereafter attributed to Raul. We note that,

---

[9] (Citation omitted.) *Cessna Finance Corp. v. Design Engineering & Constr. Intl.*, 176 Ga. App. 206, 208 (335 SE2d 625) (1985).

[10] Jose testified that he had never seen the Stock Acceptance Agreement and that his understanding was that Hector had been removed as a shareholder because he had stopped working at the Wise restaurant.

> [i]n a case where the direct evidence is not all one way, or where there are proved facts and circumstances which could be taken as inconsistent with the direct positive testimony, the trier of fact may always consider the relationship and the feeling of the witnesses toward the parties, as well as all the facts and circumstances of the case, including the witnesses' manner of testifying, their intelligence and number. . . . Questions as to creditability and preponderance address themselves to the trier of facts.[11]

The evidence in the record that Hector was a one-third shareholder in the Corporation and that the shares were fully paid for is sufficient to support the trial court's findings.

Further, appellants' reliance on *Camp v. Eichelkraut*[12] is misplaced. There, in an action for tortious interference with existing contractual relations, plaintiff alleged that defendant's disparaging letters about him had induced certain insurance companies to withdraw their business from him.[13] The *Camp* plaintiff relied on an inference drawn from two circumstantial facts: (1) the insurers ceased to do business with him; and (2) defendant had written disparaging letters about him.[14] We held that this circumstantial evidence supported only an inconclusive inference and did not demand the conclusion that it was defendant's letters that had induced the insurance companies to stop dealing with plaintiff.[15] We further held that such an inconclusive inference did not support a verdict where the inference was rebutted by direct evidence, that is, "positive and uncontradicted testimony of unimpeached witnesses, which was perfectly consistent with the circumstantial evidence relied on by the plaintiff."[16] This direct evidence showed that the insurers had conducted their own investigations of plaintiff's business practices *before* defendant composed and posted the disparaging letters,[17] and that they reached the decision to stop doing business with plaintiff independently of defendant's actions in sending the disparaging letters.[18]

---

[11] (Citation and punctuation omitted.) *Kimbrell v. Effingham Bd. of Tax Assessors*, 191 Ga. App. 544, 546 (382 SE2d 388) (1989).

[12] 246 Ga. App. 275 (539 SE2d 588) (2000).

[13] Id. at 279 (3).

[14] Id. at 282 (3) (b) (i).

[15] Id.

[16] Id.

[17] Id. at 281 (3) (b) and (3) (b) (i) (defendant's letters were written in September and October 1995; the insurance companies conducted their own investigations in June and August 1995, and thereafter sent no more business to plaintiff).

[18] Id. at 282 (3) (b) (i).

In the case at bar, however, no inference based on circumstantial evidence was rebutted by direct testimony. The conflicts in the direct evidence presented at trial, that is, the conflicts between the testimony of Hector and Jose, as well as the conflicts within the testimony of Hector, were resolved by the trier of fact.[19] Further, the circumstantial evidence (concerning the corporate records) also presented a conflict for resolution by the trier of fact. Therefore, we find appellants' third enumeration of error to be without merit.

2. *Hector's claim for conversion.* The trial court found that "Raul Leon converted the shareholder interest of Hector Leon to his own use" in August 1998, effective January 1, 1999. In their first enumeration of error, appellants assert that Hector's interest in the Corporation is an "intangible business interest," which cannot be the subject of a claim for conversion. Although we conclude that the tort of conversion does not apply under the facts of this case, nonetheless, under the "right for any reason" rule,[20] we affirm the lower court's finding that appellants are liable for depriving Hector of his interest in the Corporation as of January 1, 1999.

In *Southern Cellular Telecom v. Banks*[21] (hereinafter *"Banks I"*), this Court stated that, under Georgia law, "[c]onversion is not available as a cause of action with respect to intangible property representing an interest in a business."[22] There, plaintiff Banks had been granted as an employment incentive a 49 percent interest in Southern Cellular Telecom North ("SCT North"), a subsidiary of defendant Southern Cellular Telecom, Inc. ("SCT").[23] Defendant Grenvicz, the primary shareholder of SCT, induced Banks to give SCT a stock option to purchase her interest in SCT North at 1.5 times net earnings. Grenvicz intentionally failed to disclose to Banks that he had already contracted to sell her interest to a third party at 18 times earnings.[24] This Court ruled that plaintiff's 49 percent interest in the corporation was "an intangible property interest[, and] under Georgia law, no action can be brought for conversion of an intangible property interest."[25] The description given of Banks's property right in the corporation indicates that, at the time she granted the stock option to SCT, she had not yet received the actual certificates for

---

[19] *Kimbrell*, supra.

[20] *Marshall v. W. E. Marshall Co.*, 189 Ga. App. 510, 511 (I) (1) (376 SE2d 393) (1988) ("We will not reverse when the trial court makes the right ruling albeit for the wrong reason") (citation omitted).

[21] 208 Ga. App. 286 (431 SE2d 115) (1993).

[22] (Citation omitted.) Id. at 290 (1).

[23] Id. at 286.

[24] Id.

[25] Id. at 290 (1).

shares in SCT North representing her 49 percent interest.[26] Indeed, Banks did not even argue that her intangible property interest in SCT North was merged with a document such as a stock certificate.[27] She invited this Court to extend the law of conversion in Georgia to include intangible property. We were not persuaded to do so.[28]

Under the facts of the case at bar, *Banks I* is controlling authority, and more recent developments in the Georgia law of conversion have not operated to vitiate it.[29] Appellants cite a series of Georgia cases in support of the proposition that the conversion of a stock certificate operates also as a conversion of the intangible rights identified with that stock certificate; in each of these cases, however, the intangible rights for which recovery is sought were merged in one or more documents — such as stock certificates.[30] These cases do not stand for the proposition that conversion of an interest in a corporation will lie absent the stock certificate that represents it.[31] In the case at bar, the stock certificates had not been issued. Therefore, Raul could not have converted Hector's stock certificate, i.e., Hector's document.[32]

Nonetheless, a cause of action for tortious deprivation of an interest in a corporation does exist.[33] As noted in the Restatement (Second) of Torts, "One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability *similar to* that for conversion, even though the

---

[26] Throughout the opinion, the Court refers to Banks's property interest in SCT North as "her ownership interest," or "her 49 percent interest" (id. at 286 passim), rather than as ownership of shares in SCT North.

[27] Id. at 290 (1).

[28] Id.

[29] See, e.g., *Decatur Auto Center*, supra at 821 (where defendant bank paid plaintiff's check despite stop-payment order, plaintiff could sue for conversion of check and the full value of the intangible rights identified with the check, without any necessity to establish the specific dollars or coins represented by the face value of the check). Accord *Tidikis v. Network for Med. &c. Research*, 274 Ga. App. 807, 814 (619 SE2d 481) (2005) (on motion for reconsideration) (cause of action for conversion allowed for intangible rights merged in documents representing membership units, "Clawback Shares," and stock options).

[30] E.g., *W. E. Marshall Co.*, supra at 511, 513 (II) (6) (conversion of stock certificate representing shares in family-controlled close corporation); *Bromley v. Bromley*, 106 Ga. App. 606, 609-610 (1) (127 SE2d 836) (1962) (shares of closely-held corporation transferred to defendant as collateral were converted by defendant when he demanded payment in excess of the amount secured by the stock collateral).

[31] See Restatement (Second) of Torts § 242 (1) ("Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights"), quoted with approval in *Decatur Auto Center*, supra at 820, n. 7.

[32] See *Condrey v. SunTrust Bank of Ga.*, 431 F3d 191, 196 (I), n. 4, 202 (II) (B) (4) (5th Cir. 2005) (applying Georgia law, the Fifth Circuit distinguished *Decatur Auto Center* and affirmed summary judgment for defendants on plaintiffs' conversion claim, where rights allegedly converted were intangible and were not represented by any document).

[33] *Mon Ami Intl. v. Gale*, 264 Ga. App. 739, 743 (3) (592 SE2d 83) (2003); cf. *Bromley*, supra.

document is not itself converted."[34] Thus, the Restatement, though it does not recognize conversion as a cause of action where there is no document, does recognize that a tort analogous to conversion — a "quasi-conversion" — has occurred.[35]

Although technically the circumstances of the case at bar do not amount to conversion, nonetheless, under these facts, there has been a deprivation of Hector's stock interest in the Corporation. Hector was held out by appellants as a shareholder in the Corporation; he believed himself to be a shareholder; he convinced the trier of fact that he was a shareholder (see Division 1 above); and he was deprived of his interest in the Corporation by appellants. Hector's claim for deprivation of his interest in the Corporation is not barred as a matter of law.[36] Therefore, we reject appellants' first enumeration of error.

3. *Statute of Frauds.* In their second enumeration of error, appellants assert that Hector's claim for conversion of his intangible interest in the Corporation is barred by the Statute of Frauds, as it was in effect in 1995.[37] We conclude that the Statute of Frauds has no bearing on this case.[38] Hector does not seek to enforce an oral contract for the sale of securities; on the contrary, he seeks to recover damages for the tortious deprivation of his interest — already acquired and

---

[34] (Emphasis supplied.) Restatement (Second) of Torts § 242 (2).

[35] The caution exercised by the Restatement in this regard may have as its foundation the inflexible measure of damages for conversion ("the full value of the chattel at the time and place of conversion," equivalent to a forced sale, according to Wm. L. Prosser, Handbook of the Law of Torts § 15, p. 80 (4th ed. 1971)). This measure of damages may not be appropriate in every case where the intangible rights are not merged in a document.

[36] See also *Mon Ami Intl.*, supra (divesting a minority shareholder of ownership states claim for breach of fiduciary duty, where corporate assets were transferred to another corporate entity without acknowledging minority shareholder's ten percent interest).

[37] OCGA § 11-8-319, as in effect in 1995, provided:

A contract for the sale of securities is not enforceable by way of action or defense unless: (a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker, sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price. . . .

Effective July 1, 1998, OCGA § 11-8-319 was repealed and replaced by OCGA § 11-8-113, which eliminated the requirement of a writing. Ga. L. 1998, p. 1323, § 1. The version of the statute in effect in 1995 would apply to the case at bar. See *Belcher v. Bremer*, 253 Ga. App. 745, 746 (1) (560 SE2d 324) (2002) (this Court applied the version of the statute in effect at the time the agreement at issue was allegedly made).

[38] See generally, e.g., *Belcher*, supra at 745, 747 (1) (Statute of Frauds barred action for breach of oral agreement to sell stock in closely held corporation); *Kueffer Crane &c. v. Passarella*, 247 Ga. App. 327, 328 (1) (543 SE2d 113) (2000) (Statute of Frauds did not bar action by employee to obtain five percent interest in corporation under oral employment agreement); *Thompson v. Kohl*, 216 Ga. App. 148, 151 (2) (453 SE2d 485) (1994) (Statute of Frauds did not bar enforcement of oral agreement by an employer to transfer corporate stock to an employee for a nonmonetary consideration, such an agreement not being a "sale" within the meaning of the Statute of Frauds).

paid for — in the Corporation. (See Divisions 1 and 2 above.) Appellants' second enumeration of error is without merit.

4. *Breach of fiduciary duty.* In their fifth enumeration of error, appellants assert that the trial court erred in finding that Raul had breached a fiduciary duty of fair and equitable treatment owed to Hector, a minority shareholder. We find no error and affirm the finding of the trial court.

Appellants argue that Hector was not himself a shareholder at all, because he had not paid the purchase price of the shares. We have already ruled against appellants on the status of Hector as a shareholder in Division 1 above.

Appellants further argue that Raul owed no duty of fair and equitable treatment to Hector because Raul was himself a minority shareholder. This argument ignores the facts of this case. The uncontradicted evidence shows that Raul held a controlling position among the three shareholders, by virtue of his prior business experience, his current business connections, and his authority as the "boss." Jose testified that he routinely gave Raul cash from restaurant operations. When asked if Raul gave him receipts for these cash payments, Jose answered, "How can I ask [Raul] to give me a receipt for the money I gave? He was the boss. He was the important one there." Jose further testified that he always did what Raul told him to do. Because Raul and Jose together controlled the majority of the stock in the Corporation, the trier of fact was authorized to find that Raul acted as the controlling shareholder both before and after seizing Hector's stock interest. Further, the duty to treat minority shareholders fairly and equitably falls not only on majority shareholders, but also on officers and directors.[39] In this case, Raul's fiduciary relationship with minority shareholder Hector arose also out of Raul's position as president and director of the Corporation.

5. *Damages.* In their fourth enumeration of error, appellants assert that the trial court erred in determining damages. We affirm as to the award of lost profits ($57,759) and reverse as to the award of money had and received ($36,500 and $1,000). As to the award for the value of Hector's one-third interest in the Corporation on January 1, 1999, we vacate the lower court's order and remand with direction.

(a) First, appellants challenge the trial court's finding that Hector "was entitled to $57,759 as profits for the year 1998, and 1999 [sic]." The award by the lower court "for 1998, and 1999" is clearly a lapsus calami,[40] a clerical error; the judge intended to refer to 1997

---

[39] *W. E. Marshall Co.*, supra at 512 (I) (2) (fiduciary duty to protect minority shareholders falls on majority shareholders as well as on officers and directors of closely-held corporation).

[40] *City of Barnesville v. Stafford*, 161 Ga. 588, 591 (131 SE 487) (1926).

and 1998. In his findings of fact, the judge stated that the corporate records showed distributions to Hector of $14,843 in 1997 and $42,916 in 1998 (totaling $57,759) and that these distributions were made not to Hector, but only to Raul. This award is supported by the evidence. Raul deprived Hector not only of his ownership interest in the Corporation as of January 1, 1999, but also of the distributions purportedly made to him by the Corporation in the years 1997 and 1998. Therefore, we affirm the trial court's award of $57,759 in lost profits to Hector.

(b) Second, appellants assert that the valuation of the Corporation by the trial court was inconsistent with its finding that Hector was actually deprived of his stock interest as of January 1, 1999. We agree and remand to the trial court for recomputation of the value of Hector's interest in the Corporation.

In its Amended Order, the trial court found that the value of one-third of the Corporation on January 1, 1999, was $43,865. The trial court determined this value by dividing the Corporation's profits for 1999 ($131,595) by three. Not only is this methodology without any basis in the evidence presented at trial, but it contradicts the finding of the trial court that Hector had been deprived of his ownership interest in the Corporation at the beginning of 1999. In applying a valuation which used profits from 1999, *after* Hector had been removed as a shareholder, the trial court has applied a standard erroneous as a matter of law.[41] The fact that this part of the judgment in favor of Hector is within the range of evidence presented[42] is irrelevant, because we cannot say what the trial judge would have concluded if he had applied the correct standard.[43]

(c) Appellants further contend that the awards for both the value of Hector's interest in the Corporation ($43,865) and for money had and received ($36,500 and $1,000) represent a double recovery. We agree and reverse the awards totaling $37,500 for money had and received.

The trial court found that "Hector . . . paid to Raul . . . $37,500 . . . for which Hector . . . was to receive a one third interest in the proposed endeavor" and that "Hector . . . paid what was required of him in money to become an associate in the business." Hector is entitled to recover the value of his one-third ownership interest as of January 1, 1999, the date he was deprived of this interest; he cannot also recover

---

[41] See *Marathon Oil Co. v. Hollis*, 167 Ga. App. 48, 51 (2), 53 (6) (305 SE2d 864) (1983) (remand for recomputation of damages for breach of construction contract).

[42] Hector's expert testified that one-third of the value of the Corporation on January 1, 1999, was $123,911. Hector submitted the only evidence of damages; appellants did not introduce any evidence of damages at trial.

[43] *Marathon Oil Co.*, supra at 51 (2).

the investment he made to achieve that interest. "Georgia, as part of its common law and public policy, has always prohibited a plaintiff from a double recovery of damages; the plaintiff is entitled to only one recovery and satisfaction of damages, because such recovery and satisfaction is deemed to make the plaintiff whole."[44]

6. *Attorney fees.* In several enumerations of error, appellants challenge the trial court's award of attorney fees ($55,000) and expenses of litigation ($17,500) under OCGA § 13-6-11[45] against both Raul and the Corporation. "In order to recover attorney fees as expenses of litigation pursuant to OCGA § 13-6-11, the plaintiff must show that the defendant acted in bad faith, was stubbornly litigious, or caused the plaintiff unnecessary trouble and expense."[46] "We will affirm an award of attorney fees under OCGA § 13-6-11 if there is any evidence to support it."[47]

(a) Appellants' sixth enumeration of error, that the award of attorney fees and expenses is barred as a matter of law because the underlying claims failed,[48] is without merit in light of our rulings in Divisions 1 and 2 above, affirming the judgment of the trial court on the underlying claims in this case. As Hector concedes in his brief, however, the trial court found that it was Raul who deprived Hector of his interest in the Corporation. Therefore, the award for attorney fees and expenses lies only against Raul, and we reverse the trial court's award of attorney fees and expenses against the Corporation.

(b) In its Amended Order, the trial court awarded attorney fees and expenses of litigation under OCGA § 13-6-11 based on its finding that "the Defendants Monterrey Mexican Restaurant of Wise, Inc., Michael T. Smith, as Successor Administrator, [sic] of the Estate of Raul Leon, have been stubbornly litigious, have acted in bad faith, and caused plaintiff unnecessary trouble and expense, *in contesting this claim.*" (Emphasis supplied.) In their seventh enumeration of error, appellants challenge this award on the ground that an award under OCGA § 13-6-11 for bad faith cannot be based on appellants'

---

[44] (Citations omitted.) *Ga. Northeastern R. v. Lusk*, 277 Ga. 245, 246 (1) (587 SE2d 643) (2003).

[45] OCGA § 13-6-11 provides:

The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

[46] *Computer Communications Specialists v. Hall*, 188 Ga. App. 545, 547 (3) (373 SE2d 630) (1988).

[47] (Footnote omitted.) *4WD Parts Center v. Mackendrick*, 260 Ga. App. 340, 345 (2) (c) (579 SE2d 772) (2003).

[48] See *Instrument Repair Svc. v. Gunby*, 238 Ga. App. 138, 141 (4) (518 SE2d 161) (1999) ("The absence of liability for compensatory damages precludes an award of OCGA § 13-6-11 attorney fees or other expenses of litigation").

actions "in contesting this claim." The appellants are correct about the law but mistake the real basis for the trial court's award. "It is well settled that the 'bad faith' contemplated by this Code section is bad faith connected with 'the transaction and dealings out of which the cause of action arose,' rather than bad faith in defending or resisting the claim after the cause of action has already arisen."[49] Thus, the lower court's finding of bad faith "in contesting this claim" would, absent its other findings, be insufficient to support the award of attorney fees.[50] As we discussed in Division 2 above, however, Raul's actions gave rise to a claim for an intentional tort analogous to conversion. "[E]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees."[51] Further, the question of bad faith in the underlying transaction is for the trier of fact to determine.[52] The trial court found that Raul had deliberately deprived Hector of his ownership interest in the Corporation and that Raul had thereafter treated this stock interest as his own, thus indicating the "bad faith" necessary to support an award of attorney fees under OCGA § 13-6-11. The mere fact that appellants were *also* found to have acted in bad faith "in contesting the claim" does not absolve them of responsibility for their bad faith in depriving Hector of his stock interest.

(c) Because we have determined that the claim for attorney fees and expenses under OCGA § 13-6-11 is properly based on bad faith in the underlying transaction, we do not need to address appellants' eighth enumeration of error, concerning the existence of a bona fide controversy. The requirement of "no bona fide controversy" applies only in the absence of a finding of bad faith.[53]

---

[49] (Citations omitted.) *Computer Communications Specialists*, supra (in a dispute over the termination of plaintiff's employment, employer's later attempts to settle the claim could not be used as evidence of "bad faith" in order to justify a grant of attorney fees under OCGA § 13-6-11). Accord, e.g., *Smith v. Stuckey*, 233 Ga. App. 103, 107 (3) (503 SE2d 284) (1998) (attorney fees could not be based on bad faith where there was no showing that defendant "acted through ill will or furtive design" in his performance of the underlying contract).

[50] See, e.g., *Marshall v. King & Morgenstern*, 272 Ga. App. 515, 522 (8) (613 SE2d 7) (2005) (where a bona fide controversy exists, an award of attorney fees must be supported by a showing of bad faith in the underlying transaction); *Pulte Home Corp. v. Woodland Nursery &c.*, 230 Ga. App. 455, 457-458 (4) (496 SE2d 546) (1998).

[51] (Citations and punctuation omitted.) *Tyler v. Lincoln*, 272 Ga. 118, 122 (2) (527 SE2d 180) (2000). See also *Felker v. Chipley*, 246 Ga. App. 296, 298 (2) (540 SE2d 285) (2000).

[52] *Tyler*, supra.

[53] *4WD Parts Center*, supra (where bad faith is not an issue and a bona fide controversy clearly exists between the parties, there is not "any evidence" to support an award under OCGA § 13-6-11 based on stubborn litigiousness or unnecessary trouble and expense).

(d) In their ninth enumeration of error, appellants assert that the trial court erred in failing to allocate its award of attorney fees based on the amount spent on the claims on which Hector prevailed. We agree.

As the Supreme Court made clear in *United Cos. Lending Corp. v. Peacock*,[54] attorney fees and other expenses of litigation may only be awarded as to claims on which the plaintiff is successful.[55] In *United*, the Supreme Court stated that "[a] prerequisite to any award of attorney fees under OCGA § 13-6-11 is the award of damages or other relief on the underlying claim."[56] Thus, where plaintiffs "prevailed and were awarded damages under only one of the six counts initially sought,"[57] the lump-sum award of attorney fees was reversed and remanded to the trial court for an evidentiary hearing in order that it be limited to the amount "attributable solely to the claim in which [plaintiffs] prevailed."[58] Although a close reading of *United* shows that the Supreme Court used the terms "counts" and "claims" interchangeably,[59] nonetheless it is clear that where verdicts for damages are returned on some counts but not on others, any award of attorney fees under OCGA § 13-6-11 must be apportioned as to the prevailing counts.

Appellees argue, however, that attorney fees under OCGA § 13-6-11 need not be apportioned to the prevailing counts where defendants acted in bad faith as to the underlying transaction, citing *CSX Transp. v. West*.[60] CSX, however, relied on *Crocker v. Stevens*,[61] a 1993 decision of this Court which is not in line with the Supreme Court's later decision in *United*.[62]

---

[54] 267 Ga. 145 (475 SE2d 601) (1996).

[55] Id. at 147 (2). See, e.g., *Forsyth County v. Martin*, 279 Ga. 215, 219-220 (2) (c) (610 SE2d 512) (2005) (award of attorney fees under OCGA § 13-6-11 limited to those costs expended on the claims on which plaintiff prevailed). Accord *Davis v. Johnson*, 280 Ga. App. 318, 322 (634 SE2d 108) (2006) (appellate court struck jury's award of attorney fees under OCGA § 13-6-11 where plaintiff did not prevail on underlying claim); *Freeman v. Wheeler*, 277 Ga. App. 753, 757 (627 SE2d 86) (2006) (where summary judgment for defendant was properly granted on underlying claim, summary judgment was also proper as to claim for attorney fees under OCGA § 13-6-11); *Instrument Repair Svc.*, supra.

[56] *United*, supra.

[57] Id.

[58] Id.

[59] Id.

[60] 240 Ga. App. 209, 212 (3) (b) (523 SE2d 63) (1999) ("In our view, a party acting in bad faith should pay the full price for losing") (citation omitted).

[61] 210 Ga. App. 231, 238 (8) (435 SE2d 690) (1993), disapproved on other grounds, *Kim v. Lim*, 254 Ga. App. 627 (563 SE2d 485) (2002).

[62] Supra. See generally *Trotter v. Summerour*, 273 Ga. App. 263, 267 (2), n. 3 (614 SE2d 887) (2005) (in dicta, Court notes conflict between *CSX* and *United*); *Paul v. Destito*, 250 Ga. App. 631, 643 (9), n. 32 (550 SE2d 739) (2001) (without reaching the issue of allocation of attorney fees, Court in dicta questions *CSX* in light of *United*).

The Supreme Court in *United* did not consider the basis of the award of attorney fees when it required the apportionment of the award to the prevailing claim.[63] Thus, the *United* requirement of apportionment does not depend on the reason for the grant of attorney fees pursuant to OCGA § 13-6-11, whether bad faith, stubborn litigiousness, or unnecessary trouble and expense. Further, *United* cited[64] *Southern Cellular Telecom v. Banks*[65] ("*Banks II*"), which required the apportionment of attorney fees to the successful claim[66] where a *fraud* claim (a claim indicative of bad faith) was the only claim of a ten-count complaint to survive the defendants' motions for summary judgment and directed verdict.[67] The Court in *Banks II* found that the award of attorney fees was not supported by sufficient evidence, because attorney time sheets for work "performed in connection with the entire case . . . fail[ed] . . . to permit the court to distinguish between time and expenses attributable to the successful fraud claim and time and expenses attributable to [plaintiff's] other unsuccessful claims."[68] Without discussion of the underlying ground for the grant of attorney fees, *Banks II* vacated the award of attorney fees and remanded to the trial court for an evidentiary hearing "to establish the amount of attorney fees related solely to the prevailing claim."[69]

We conclude that *United* is controlling authority, and that it overruled *Crocker* by implication on this issue. We now hold that, where attorney fees are awarded under OCGA § 13-6-11 for bad faith, such awards must be apportioned to those attorney fees attributable to claims on which the plaintiff prevailed.[70] It follows that those opinions of this Court which did not require apportionment of bad faith attorney fees were wrongly decided and must be overruled as to this issue, including *Ins. Co. of North America v. Allgood Elec. Co.*,[71]

---

[63] *United*, supra. In fact, it is not clear from the *United* opinion exactly which one of the six original counts was successful. Id. at 145-146.

[64] Id. at 147 (2).

[65] 209 Ga. App. 401 (433 SE2d 606) (1993).

[66] Id. at 402.

[67] Id. at 401.

[68] Id. at 402.

[69] Id. Accord, e.g., *Premier Cabinets v. Bulat*, 261 Ga. App. 578, 582, n. 12, 583 (5) (583 SE2d 235) (2003) (citing *Banks II* and *United*, Court reversed award of OCGA § 13-6-11 attorney fees and remanded for hearing to allow plaintiff to establish amount of fees attributable to successful negligent construction claim); *SKB Indus. v. Insite*, 250 Ga. App. 574, 578-579 (3) (551 SE2d 380) (2001) (citing *Banks II* and *United*, Court reversed award of attorney fees for bad faith and remanded for apportionment as to prevailing promissory estoppel claim).

[70] Id.

[71] 229 Ga. App. 715, 719 (3) (a) (494 SE2d 728) (1997) (whole court opinion).

*CSX*,[72] and *Lincoln v. Tyler*,[73] as well as any other opinions of this Court which failed to require apportionment of attorney fees based on bad faith.

We do not, however, overrule cases such as *McDonald v. Winn*,[74] where this Court rejected defendants' argument that expenses of litigation awarded under OCGA § 13-6-11 should be apportioned by *issue*, so that, "for example, . . . if [defendants] were in bad faith in denying the existence of [a] written agreement, only those expenses incurred in connection with proof of the written agreement should be awarded."[75] *McDonald* refused to impose such a limitation on OCGA § 13-6-11,[76] and this decision is still good law.

Accordingly, we vacate the trial court's award of attorney fees and expenses, and we remand this case to the trial court with direction to conduct an evidentiary hearing on the award of attorney fees and expenses of litigation and to apportion the award to the amount attributable to the claims on which Hector prevailed.[77]

7. *Prejudgment interest.* In their last enumeration of error, appellants assert that the trial court erred in awarding prejudgment interest, as it was not authorized by OCGA § 7-4-15[78] (regarding prejudgment interest on liquidated demands), nor has Hector complied with OCGA § 51-12-14[79] (governing interest on unliquidated damages in tort actions). We agree and reverse the awards of prejudgment interest.

"Prejudgment interest is allowable only when the amount recoverable is liquidated. Liquidated means fixed and certain, a sum that cannot be changed by proof."[80] "A debt is liquidated when it is certain how much is due and when it is due";[81] a claim is not liquidated where

---

[72] Supra.

[73] 258 Ga. App. 374, 377 (2) (574 SE2d 440) (2002).

[74] 194 Ga. App. 459 (390 SE2d 890) (1990).

[75] Id. at 461 (4).

[76] Id.

[77] *United,* supra.

[78] OCGA § 7-4-15 provides in part, "All liquidated demands, where by agreement or otherwise the sum to be paid is fixed or certain, bear interest from the time the party shall become liable and bound to pay them."

[79] OCGA § 51-12-14 provides procedures and circumstances under which a plaintiff in a tort action may be entitled to receive interest prejudgment. See, e.g., *Hodges v. Effingham County Hosp. Auth.,* 182 Ga. App. 173, 178 (7) (355 SE2d 104) (1987) (no prejudgment interest allowed where plaintiff in tort case failed to comply with OCGA § 51-12-14).

[80] (Citation omitted.) *Wilkinson Homes v. Stewart Title Guaranty Co.,* 271 Ga. App. 577, 583 (5) (610 SE2d 187) (2005).

[81] (Citation and punctuation omitted.) *Marathon Oil Co.,* supra at 51 (3) (action for breach of contract for construction work). Accord, e.g., *Corr v. Aaron Rents,* 136 Ga. App. 643, 644 (222 SE2d 150) (1975) (correct value of shares of stock was an unliquidated claim, because it "remained in doubt until the final court ruling").

its amount could only be established by the trier of fact.[82] "The general rule is that interest is not recoverable upon unliquidated demands, but is allowable only after such demands shall have become merged in a judgment."[83] This general rule applies to actions to recover the value of stock in a closely held corporation.[84] Thus, the damages awarded by the lower court in the case at bar will not be liquidated until merged in its final judgment.[85]

Appellee correctly points out that, in an action for conversion of specific money, prejudgment interest may be recovered from the date of conversion.[86] As we determined in Division 2 above, however, the facts of this case do not give rise to a cause of action for conversion. As Hector has not complied with OCGA § 51-12-14, Hector is not entitled to prejudgment interest.

8. *Disposition.* We remand this case to the trial court for recomputation of the value of Hector's one-third interest in the Corporation on January 1, 1999, in accordance with Division 5 (b) above, and for an evidentiary hearing concerning the allocation of attorney fees and expenses, in accordance with Division 6 (d) above. The trial court is also directed to delete its awards to Hector for money had and received, in accordance with Division 5 (c) above; to delete any award to Hector for prejudgment interest, for the reasons discussed in Division 7 above; and to delete its award for attorney fees and expenses against the Corporation, in accordance with Division 6 (a) above. In all other respects, we affirm the Amended Order of the trial court.

9. *Motion denied.* Appellants' Motion for Non-Consideration of Appellee's Brief is denied.

*Judgment affirmed in part and reversed in part, and case remanded with direction. Ruffin, C. J., Andrews, P. J., Johnson, P. J., Blackburn, P. J., Smith, P. J., Barnes, Miller, Ellington, Phipps, Adams and Bernes, JJ., concur.*

DECIDED NOVEMBER 17, 2006.

---

[82] *Marathon Oil Co.*, supra at 52 (3).

[83] (Citation and punctuation omitted.) *Lincoln Lumber Co. v. Keeter*, 167 Ga. 231, 236 (145 SE 68) (1928). Accord *Corr*, supra.

[84] *Lincoln Lumber*, supra (interest would not run until the disputed value of the stock interest was determined either by agreed-upon arbitration or by the final decision of the court). Accord *Corr*, supra.

[85] *Corr*, supra.

[86] *Felker*, supra at 296-297 (1) (in an action for conversion of specific partnership funds, "a plaintiff suing for the conversion of money may recover the amount of money converted, plus interest from the date of conversion") (footnote omitted).

*Andrew, Merritt, Reilly & Smith, Michael T. Smith, Raymon D. Burns, Brook A. Davidson,* for appellants.
*Davis, Matthews & Quigley, Ron L. Quigley,* for appellee.