A09A0920, A09A0921. BROWN et al. v. RADER et al.;
and vice versa.
(683 SE2d 16)

ANDREWS, Presiding Judge.

In the course of a dispute arising from the flooding of the house Keith and Angela Brown rented from Donald and Christa Rader, Mrs. Rader reported child abuse by Mrs. Brown to the Department of Family and Children Services (DFACS). In April 2005, the Browns sued the Raders for defamation, emotional distress, and breach of contract, seeking damages, remediation expenses, three times their $900 security deposit, attorney fees, and punitive damages. The trial

---

court granted summary judgment to the Raders concerning the claims for defamation, emotional distress, treble damages, fees, and punitive damages, but denied summary judgment on the claim for breach of contract. On appeal in Case No. A09A0920, the Browns argue that the trial court erred when it granted the Raders summary judgment on the defamation claim, including fees and punitive damages, and when it refused to authorize the recovery of fees expended concerning the contract claim. On cross-appeal in Case No. A09A0921, the Raders argue that the trial court erred when it denied summary judgment on the contract claim. We affirm the trial court's judgment except as to the matter of fees expended in pursuit of the Browns' contract claim.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." (Citations and punctuation omitted.) *Walker v. Gwinnett Hosp. System*, 263 Ga. App. 554, 555 (588 SE2d 441) (2003). A trial court's grant of summary judgment is reviewed de novo on appeal, construing the evidence in the light most favorable to the nonmovant. *Ethridge v. Davis*, 243 Ga. App. 11, 12 (530 SE2d 477) (2000). Once the party moving for summary judgment has made a prima facie showing that it is entitled to judgment as a matter of law, the nonmovant must then come forward with rebuttal evidence sufficient to show the existence of a genuine issue of material fact. *Weldon v. Del Taco Corp.*, 194 Ga. App. 174 (390 SE2d 87) (1990).

So viewed, the record shows that the Browns had been renting a house in Savannah from the Raders for more than two years when, on June 22, 2004, a rainstorm caused flooding at the house. The following day, workers treated the house with enzymes and installed blowers to aid drying. Mrs. Brown developed a headache as a result of the treatments, asked Rader to come over to the house, and told him that she and her family, including her six-year-old son, needed lodging for the night. Rader refused, and the family went to Mr. Brown's parents' house for the night.

Over the next two weeks, Mrs. Brown developed migraine headaches and nosebleeds, and her son vomited at times. The family spent nights with relatives or at a motel. After further enzyme treatments and the removal of most of the carpet in the house, Rader arrived on the evening of July 6 to examine the property. Mrs. Brown testified that after a short time at the house, Rader told her that she "was just a stupid housewife who [didn't] know what [she was] talking about"; that she could sue him, but "[wouldn't] get a damn dime"; and that when samples came back negative, he would not "want to hear any more of [her] bitching!" The Browns returned to Mr. Brown's parents' house.

On July 8, a Chatham County Health Department worker,

Sharon Varn, arrived to inspect the house and to take samples. On July 13, Varn informed Mrs. Brown that "massive" amounts of Stachyborus mold had been found inside the house. The next day, July 14, Varn met with the Browns along with Mrs. Rader, a claims adjuster, and a neighbor hired to perform remediation. At this meeting, Varn repeated the mold finding and informed the group that the Browns could no longer stay there and would have to move out all their belongings. Varn also reported that while short visits were permissible for the purpose of retrieving the Browns' belongings, masks should be worn while inside the house, and that remediation would take approximately a month. Mrs. Rader agreed at the time that the Raders would pay for lodging and for the removal, decontamination, and storage of the Browns' belongings; give them a few days to sort out the things they would need; work with them to find appropriate lodging; release them from paying July rent; finish and pay for remediation before the school year started in August; and have some utilities transferred into the Raders' name for the duration of the remediation.

Only a few days later, however, the parties were disputing the timing and location of the Browns' temporary housing. After Varn intervened on the Browns' behalf, the Raders agreed to place the Browns at the motel of their choice. By July 20, however, the Browns began looking for other permanent lodging because they felt "there would be insufficient time before school started to decontaminate [their] personal belongings and remediate the mold in the house."

On July 30, the Browns received a letter from the Raders' attorney enclosing a report including findings of "massive" amounts of Stachyborus spores warranting remediation. The Browns also discovered that on July 21, Mrs. Rader had reported to DFACS that she had seen the family in the house for up to six hours "on several occasions" after the mold report of July 13 and that the Browns' son did not wear a mask during these visits. In her deposition, Mrs. Brown was asked whether her son had worn a mask "while he was in [the house]" after July 5. She replied, "No, sir."[1] In her subsequent affidavit, however, Mrs. Brown averred that her son had never been inside the house after July 13 for more than a few minutes and that he had always worn a mask when he was inside.

1. The Browns first argue that the trial court erred when it granted the Raders summary judgment on the defamation claim. We disagree.

---

[1] Contrary to the dissent's assertions, no construction of Mrs. Brown's immediately subsequent testimony that her son wore a mask on visits between August 1 and August 5 can vitiate her unambiguous testimony that he did not do so on some visits to the house after July 5. The assertion that the child sometimes wore a mask implicitly includes the admission that he sometimes did not.

OCGA § 51-5-4 defines slander to include either "(1) [i]mputing to another a crime punishable by law" or "(4) [u]ttering any disparaging words productive of special damage which flows naturally therefrom." A slander is published when it is "communicated to anyone other than the person slandered." *Scouten v. Amerisave Mtg. Corp.*, 283 Ga. 72, 73 (1) (656 SE2d 820) (2008).

(a) The Raders argue that because reports made to DFACS are confidential,[2] Mrs. Rader's report was never "published." But the law requires only that the written statement be disseminated to any person other than the person slandered — here, the DFACS worker who received the report. Nor did the alleged slander come under the intracorporate exception to the publication rule. Compare *Scouten*, 283 Ga. at 73 (1), citing *Atlanta Multispecialty Surgical Assoc. v. DeKalb Med. Center*, 273 Ga. App. 355, 357 (3) (615 SE2d 166) (2005). It follows that Mrs. Rader's oral allegations to DFACS amounted to "publication" for purposes of the defamation statutes.

(b) Neither the parties nor the trial court addressed below whether Mrs. Rader's report to DFACS either imputed a crime to the Browns[3] or amounted to disparaging words producing special damages. See *Riddle v. Golden Isles Broadcasting*, 292 Ga. App. 888, 891 (1) (666 SE2d 75) (2008); *Walker v. Walker*, 293 Ga. App. 872, 876-877 (2) (e) (668 SE2d 330) (2008). We thus pretermit the question, *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 828-829 (2) (573 SE2d 389) (2002), and consider whether the trial court properly granted immunity.

(c) The reporting statute, OCGA § 19-7-5, defines "child abuse" as including "[n]eglect or exploitation of a child by a parent or caretaker thereof." OCGA § 19-7-5 (b) (3) (B). Subsection (c) provides that certain persons including doctors, teachers and other professionals "having reasonable cause to believe that a child has been abused *shall* report or cause reports of that abuse to be made." (Emphasis supplied.) Subsection (d) provides that "[a]ny other person . . . who has reasonable cause to believe that a child is abused *may* report or cause reports to be made as provided in this Code section." (Emphasis supplied.) Finally, subsection (f) provides limited immunity to those making reports under either previous subsection:

> Any person or persons . . . participating in the making of a
> report or causing a report to be made to a child welfare
> agency providing protective services or to an appropriate

---

[2] See OCGA § 49-5-40 (b).

[3] See, for example, OCGA § 16-12-1 (b) (3) (contributing to the deprivation of a minor).

> police authority *... shall in so doing be immune from any civil or criminal liability* that might otherwise be incurred or imposed, *provided such participation pursuant to this Code section or any other law is made in good faith. Any person making a report, whether required by this Code section or not, shall be immune from liability as provided in this subsection.*

(Emphasis supplied.) The Supreme Court of Georgia has held that immunity under OCGA § 19-7-5 (f) should be granted to a person making a report with either the "reasonable cause" specified in subsections (c) and (d) or the "good faith" specified in subsection (f). *O'Heron v. Blaney*, 276 Ga. 871, 872-874 (1), (2) (583 SE2d 834) (2003).

Although Mrs. Brown's affidavit denied the report's essential allegation that the Browns brought their son into the house on at least one occasion after the flood without the benefit of a protective mask, she admitted in her deposition that her son was sometimes in the house without a mask after July 5. Because Mrs. Rader thus had reasonable cause for her allegation that the Browns' son was sometimes in the contaminated house without a mask, the trial court properly granted Mrs. Rader immunity. See *O'Heron*, 276 Ga. at 874 (2) (noting absence of evidence to contradict doctor's and detective's reports concerning children's allegations of molestation, holding that doctor's report was made with reasonable cause, and granting immunity to her); see also *Kersey v. United States Shoe Corp.*, 211 Ga. App. 655, 657-658 (440 SE2d 250) (1994) (applying *Prophecy* rule to exclude testimony favorable to the plaintiff's defamation claim). Even if Mrs. Rader acted with animus against the Browns, in other words, the objective basis for her report establishes her right to immunity concerning it. See *Ouellet v. Tillitski*, 269 Ga. App. 585, 588-589 (604 SE2d 559) (2004) (undisputed record showed that a mandated reporter had reasonable cause to believe that child abuse had occurred, and could therefore claim immunity, even if he had been negligent or exercised bad judgment).

(d) It follows from the above that the trial court also did not err when it granted summary judgment concerning the Browns' claims for fees and punitive damages arising from their defamation claim. See *Ellis v. Fuller*, 282 Ga. App. 307, 311 (3) (638 SE2d 433) (2006) (reversing fee award to defendant under OCGA § 13-6-11 where his counterclaim was not successful); *Nash v. Studdard*, 294 Ga. App. 845, 851 (3) (670 SE2d 508) (2008) ("Punitive damages may only be awarded in tort actions in which there is a valid claim for actual damages.").

2. In the cross-appeal, the Raders argue that the trial court erred when it denied their motion for summary judgment on the Browns' claim for breach of contract on the ground that the Raders were estopped by their promises in the matter. The Raders assert that Mrs. Rader's promises were too vague to be enforceable, lacked consideration, and were not reasonably relied upon by the Browns to their detriment. The Browns disagree, and also argue that fees are authorized on the subject.

(a) Even when a promise is unenforceable as a contract, a promisee may recover under a theory of promissory estoppel when

> (1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiffs to rely on such promise; (3) the plaintiffs relied on such promise to their detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment by surrendering, forgoing, or rendering a valuable right.

(Citation and punctuation omitted.) *Mariner Healthcare v. Foster*, 280 Ga. App. 406, 412 (5) (634 SE2d 162) (2006); see also OCGA § 13-3-44. "Promissory estoppel does not apply to a promise that is vague, indefinite, or of uncertain duration." *Mariner*, 280 Ga. App. at 412 (5). But the law "does not require that the injured party exhaust all other possible means of obtaining the benefit of the promise from any and all sources before being able to enforce the promise against the promisor." *Ambrose v. Sheppard*, 241 Ga. App. 835, 837 (528 SE2d 282) (2000). Rather, the promisee's reliance need only be reasonable. Id.

Both Mrs. Brown and Varn testified that they heard Mrs. Rader promise to undertake and pay for remediation of the property as well as the cost of decontaminating and storing the Browns' possessions in time for the commencement of the school year. This promise was apparently made in an effort to resolve the dispute, including whether the Raders had prior knowledge of flooding problems at the house and whether the Browns could continue to live in the house in the coming school year, as opposed to terminating the rental and finding permanent housing elsewhere. Pretermitting whether there was consideration for Mrs. Rader's promises, questions of fact remain as to whether the Raders should have expected the Browns to rely on these promises and whether that reliance was reasonable and to the Browns' detriment. See *20/20 Vision Center v. Hudgens*, 256 Ga. 129, 135 (7) (345 SE2d 330) (1986) (even where a tenant could not enforce a proposed lease, triable issues of fact existed on the issue

of promissory estoppel); *Ambrose*, 241 Ga. App. at 837 (reversing grant of summary judgment on promissory estoppel claim when questions of fact remained concerning plaintiffs' reasonable reliance); see also *Rental Equip. Group v. MACI*, 263 Ga. App. 155, 158 (1) (587 SE2d 364) (2003).

(b) The Browns would be entitled to fees expended on their promissory estoppel claim only if they eventually prevail on that claim. See *Southern Cellular Telecom v. Banks*, 209 Ga. App. 401, 402 (433 SE2d 606) (1993). Here, a factfinder could conclude from the apparently bitter nature of the underlying dispute that the Raders' failure to perform some substantial portion of their promises was the result of bad faith. See *Monterrey Mexican Restaurant of Wise v. Leon*, 282 Ga. App. 439, 450-451 (6) (638 SE2d 879) (2006) (affirming jury award of fees under OCGA § 13-6-11 where evidence supported a finding that defendant had acted in bad faith); *SKB Indus. v. Insite*, 250 Ga. App. 574, 578-579 (3) (551 SE2d 380) (2001) (finding sufficient evidence of bad faith concerning promissory estoppel claim to authorize an award of fees under OCGA § 13-6-11). It follows that the trial court erred when it granted summary judgment to the Raders concerning the fees expended on the Browns' promissory estoppel claim.

*Judgment affirmed in part and reversed in part in Case No. A09A0920. Judgment affirmed in Case No. A09A0921. Johnson, P. J., Blackburn, P. J., and Ellington, J., concur. Miller, C. J., Barnes and Mikell, JJ., concur in part and dissent in part.*

BARNES, Judge, concurring in part and dissenting in part.

Because I disagree that Mrs. Brown admitted the truth of Mrs. Rader's allegations concerning the child's failure to wear a mask, I dissent to Division 1 (c) and (d). I concur fully in Division 2, however, affirming the trial court's denial of summary judgment to the defendants on the plaintiffs' promissory estoppel count and reversing the trial court's grant of summary judgment to the defendants on the plaintiffs' claim for attorney fees related to that count.

The record shows that the Browns left the house on June 23, and were notified about the toxic mold diagnosis on July 13. On July 21, Mrs. Rader told the Department of Family and Children Services she had seen the family in the house for up to six hours with their son who was not wearing a mask. During her deposition, Mrs. Brown was asked, "Have you spent any night in this house, after June 23?" She responded yes, the family stayed there the weekend of July 4, before they were aware of the mold infestation. She also said the child had

been in the premises after July 5, on the days she was there. She explained:

> I was there, *during the day before we actually had the sampling done*, while my husband was at work. We spent a lot of afternoons and nights at his folks' house. I'd wait for him to get off work. He'd meet me back at the house. There [were] days that if there was something they scheduled for us to be there, I was there. I was there during the landscaping days.

The exchange continued:

> Q: Did your child have a mask, while he was there?
> A: No, sir.
> Q: Ever?
> A: Yes, sir.
> Q: When?
> A: Any of the days we were moving.
> Q: Which would have been what date?
> A: Starting August 1st through August 5th. He wasn't there each of those days, though. I did have sitters a couple of hours here and there.

Mrs. Brown was not asked if her son was at the house without a mask after she knew about the toxic mold on *July 13*. She was asked if he had been on the premises after *July 5*, and she said yes, he was in the house with her during the day before the sampling was done. Then she was asked if the child had a mask while he was there, and she said no. This testimony establishes only that the child was at the house without a mask after July 5 but before the Browns knew about the toxic mold on July 13. In her affidavit, Mrs. Brown testified that, after she received the mold report, her son was never allowed into the house without a mask on and the few times he was there were only for brief periods. This testimony is completely consistent with her deposition testimony, that her son was in the house without a mask before they had the sampling done and that he wore a mask when he was there during some of the days they moved in early August. Accordingly, the *Prophecy* rule does not apply, Mrs. Brown has not admitted the truth of Mrs. Rader's allegedly defamatory allegations, and Mrs. Rader is not entitled to immunity under OCGA § 19-7-5 (f). The trial court erred in granting summary judgment to the Raders on the Browns' defamation claim.

I am authorized to state that Chief Judge Miller and Judge

614

Mikell join in this opinion.

DECIDED JULY 10, 2009 —
RECONSIDERATION DENIED AUGUST 7, 2009

*Brennan, Harris & Rominger, Richard J. Harris*, for appellant.
*Thompson & Smith, Larry I. Smith*, for appellee.